## COMMONWEALTH *vs.* RICHARD FIGUEROA.

Essex. January 10, 2014. - May 19, 2014.

Present: IRELAND, C.J., CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Search and Seizure,* Probable cause, Search incident to lawful arrest, Exigent circumstances, Standing to object. *Practice, Criminal,* Motion to suppress, Instructions to jury, Presumptions and burden of proof, Deliberation of jury, Question by jury, Verdict, Lesser included offense, Capital case. *Constitutional Law,* Search and seizure, Identification, Burden of proof. *Due Process of Law,* Identification, Burden of proof. *Evidence,* Identification, Presumptions and burden of proof, Intent, Intoxication. *Identification. Jury and Jurors. Intent. Intoxication.*

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress evidence seized as a result of a warrantless entry by police into an apartment in which they found and arrested the defendant, and in another apartment, where there was probable cause to believe that an armed suspect was in the first apartment and the entry was justified by exigent circumstances, in that there were reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances given that taking the time to do so would have posed a significant risk that the suspect would flee, that evidence would be destroyed, or that the safety of the police or others would be endangered [211-215]; where the seizure of a duffel bag containing ammunition in the bedroom in which the defendant was arrested was justified as the result of a search incident to arrest, given that the bag was found in an area within the defendant's immediate reach [215-216]; and where the defendant did not have standing to challenge a search by police of the other apartment, where the defendant was not an overnight guest but, at most, an occasional visitor who happened to enter without knocking on some occasions [216].

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress a showup identification of the defendant by an eyewitness approximately two and one-half hours after the shooting, where, under the circumstances, there was good reason to conduct a showup identification, and the procedure, although inherently suggestive, was not so unnecessarily suggestive that it created a substantial risk of a mistaken identification. [217-218]

At a criminal trial, the Superior Court judge's instruction to the jury concerning reasonable doubt, which required the jury to be firmly convinced that the defendant was guilty of the crime charged, did not create a substantial likelihood of a miscarriage of justice, where there was not a reasonable likelihood that it caused the jury to believe that they could convict the defendant on something less than proof beyond a reasonable doubt. [218-221]

At a murder trial, the Superior Court judge's instruction to the jury concerning
the issue of intoxication neither improperly diluted the Commonwealth's
burden of proof nor improperly commented on the potential capacity of
persons who are intoxicated to form an intent. [221-222]

This court reaffirmed the adoption by Massachusetts courts of the so-called
"soft transition" rule, which provides, with regard to jury deliberation, that
judges instruct the jury to move on to consider a lesser included offense if
they do not find the defendant guilty of the greater offense, rather than
require the jury to find the defendant not guilty of the greater offense
before moving on to the lesser included offense [222-228]; thus, at a
murder trial, the judge erred in telling the jury that they were a hung jury
if they could not reach agreement on murder in the first degree, and in
furnishing them with an instruction that suggested that a failure to reach
agreement on murder in the first degree would result in a mistrial; accord-
ingly, this court reversed the defendant's conviction of murder in the first
degree and remanded the case to the Superior Court to allow the Com-
monwealth to choose between entry of a verdict of murder in the second
degree or retrial of the defendant on the charge of murder in the first
degree, where, in the unusual circumstances of the case, this court was not
substantially confident that the jury would have returned a verdict of
murder in the first degree if they had received the correct instruction
[228-230].

INDICTMENT found and returned in the Superior Court Depart-
ment on April 25, 2008.

A pretrial motion to suppress evidence was heard by *Howard
J. Whitehead*, J.; a second pretrial motion to suppress evidence
was heard by *Richard E. Welch, III*, J., and the case was tried
before him.

*Donald A. Harwood* for the defendant.

*Marcia H. Slingerland*, Assistant District Attorney, for the
Commonwealth.

GANTS, J. On the evening of January 31, 2008, the defendant
walked into a Lawrence restaurant and shot and killed Luis
Alex Alcantara (victim), with whom he had been feuding. A
Superior Court jury convicted the defendant of murder in the
first degree on a theory of deliberate premeditation, in violation
of G. L. c. 265, § 1. On appeal, the defendant raises five claims:
(1) that a motion judge erred in denying the defendant's motion
to suppress evidence seized during warrantless entries into two
apartments; (2) that a different motion judge erred in denying a
motion to suppress a showup identification of the defendant;
(3) that the trial judge's instruction on proof beyond a reasonable

doubt requires reversal of his conviction; (4) that the judge erred in instructing the jury on intoxication; and (5) that the judge erred in furnishing the jury with an instruction in accordance with *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973), and *Commonwealth* v. *Tuey*, 62 Mass. 1, 2-3 (1851) (*Tuey-Rodriquez* instruction), limited to their consideration of murder in the first degree, in response to a note from the jury asking whether they were a "hung jury" because some jurors "feel it is first degree, some feel it is second degree." The defendant also contends that we should exercise our authority under G. L. c. 278, § 33E, to reduce the conviction to a lesser degree of guilt more consonant with justice. We reject the defendant's first four claims of error, but conclude that the judge erred in giving the *Tuey-Rodriquez* instruction, and that the error created a substantial likelihood of a miscarriage of justice with respect to the jury's decision to convict the defendant of murder in the first degree rather than murder in the second degree. We therefore reverse the defendant's conviction of murder in the first degree, and remand the case to the Superior Court to allow the Commonwealth to choose between entry of a verdict of murder in the second degree or retrial of the defendant on the charge of murder in the first degree.

*Background.* Defense counsel in his opening statement said that the issue at trial was not whether the defendant shot and killed the victim (the defendant would testify that he did) but whether he was so intoxicated that he could not have formed the intent to kill or to deliberately premeditate the killing. Therefore, we summarize the evidence at trial, focusing on the evidence regarding the defendant's intent and reserving certain details for our discussion of the circumstances surrounding the two searches and the showup identification.

The victim owed the defendant $1,300 for marijuana that the defendant had sold him, and the defendant owed the victim $1,050 because another buyer that the defendant had referred to the victim had failed to pay the full purchase price.[1] The defendant told the victim that they should "call it even," but the victim

---

[1]The defendant testified that the "rule on the street" is that where one recommends a buyer to a drug seller and the buyer does not pay in full, the person who recommended the buyer is "responsible for that debt."

refused and insisted on receiving the money due to him. The defendant paid the victim $500, but the victim "kept insisting" on being paid the balance, and the two argued about the debt on several occasions prior to the shooting. The last time they crossed paths before the shooting was in mid-January, 2008, when the defendant and Nancy Alon (whom the defendant described as "a special friend" in his testimony at trial) were at a restaurant in Lawrence. The defendant saw the victim and invited him to join them at their table. After the victim touched Alon several times on the leg, the defendant told him, "Please stop disrespecting me." The victim told the defendant that if he did not like it, they could "go to the bathroom and resolve the problem there." At the entrance to the bathroom, the victim, with a hard object in his hand, struck the defendant in the nose and continued striking him. The victim pushed the defendant against the wall and began choking him. According to the defendant's testimony, the victim "was killing" him when someone pulled the victim away. When the restaurant manager escorted the defendant out of the restaurant, the defendant told him "everything was fine" but that "things [were] not going to stay that way."

Approximately four days before the shooting, Engels Baez visited the defendant and noticed that the defendant's face was bruised. The defendant showed Baez a gun and a box with ammunition inside. Baez encouraged the defendant to "throw [the box of ammunition] away," and tried to take the gun away from him, but the defendant told him to "leave it alone."

On the evening of the killing, a taxicab driver was dispatched to a restaurant in Lawrence, where the defendant entered the taxicab, said he was drunk, and asked to be taken to a Lawrence bar. As he was being dropped off, the defendant told the driver that he was going to call back for a ride in a few minutes.

The defendant did not enter the bar where he was dropped off but instead, at approximately 9:30 P.M., entered a nearby restaurant, said either "look" or "look what I got for you," and with a .357 caliber revolver fired two or three shots at the victim. The bullets struck the victim, who was seated at a table, in the leg and chest, killing him. The defendant then fled the restaurant.

After making a loop around the block, the same taxicab driver who had dropped the defendant off less than five minutes earlier saw the defendant hailing him, picked him up, and, at the defendant's direction, drove him to a two-family house at 59-61 Salem Street in Lawrence. At approximately 9:50 P.M. that night, the defendant telephoned Baez, told Baez that he "killed the guy who had beat him up," and asked for a ride, but then hung up the telephone before telling Baez where he was.

The defendant testified that he was a "cocaine addict," and, on the day of the killing, "did [cocaine] twice in the house before leaving" at around noon. Later that afternoon, he drank a bottle of rum, mixed with an energy drink, at an upholstery store while waiting for a friend.[2] He then went to a restaurant and drank two or three glasses of wine, as well as two more glasses of rum, mixed with an energy drink, and did two "passes" of cocaine. He walked to a different restaurant, where he drank wine for approximately ninety minutes and "did cocaine twice in the bathroom." He then took a taxicab to a bar, where he intended to play pool. Rather than visit that bar, he decided to walk to another nearby restaurant to see a friend who worked there. When he entered that restaurant, he saw the victim standing "as if . . . walking towards" him, at which point, the defendant testified, "I panicked and I shot him."

*Discussion. 1. Motion to suppress evidence seized at 59-61 Salem Street.* On the night of the killing, the police entered the upstairs apartment at 59 Salem Street without a warrant, where they arrested the defendant in a third-floor bedroom and seized ammunition from a blue duffel bag in that bedroom. The next morning, the police entered the first-floor apartment at 61 Salem Street without a warrant and seized a gun. Before trial, the defendant moved to suppress the evidence seized as a result of these two warrantless entries. The judge denied the motion. The judge concluded that the warrantless entry into the upstairs apartment was constitutionally reasonable because of exigent circumstances and that the search of the blue duffel bag was a

---

[2]An employee at the upholstery store testified that the defendant was sharing an approximately twelve-inch bottle of rum with another man in the store and "was kind of happy."

lawful search incident to arrest.[3] With respect to the entry the following day, the judge concluded that the defendant had no reasonable expectation of privacy in the first-floor apartment, and, thus, had no standing to challenge the constitutionality of the search of that apartment.

"In reviewing a motion to suppress, 'we accept the judge's subsidiary findings of fact absent clear error' . . . ." *Commonwealth* v. *Pacheco*, 464 Mass. 768, 769 (2013), quoting *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). We may supplement those findings "if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, 450 Mass. 818 (2008), and cases cited. We "independently determine the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369 (2007), quoting *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 50 (2004).

a. *Subsidiary finding of facts.* After an evidentiary hearing, the motion judge made the following findings of fact, which were not clearly erroneous. The Lawrence police department responded to the shooting at the restaurant at approximately 9:30 P.M., and found a man who had been shot being treated by paramedics. Witnesses at the restaurant provided a general description of the shooter. The police learned that a taxicab driver had driven a man who matched the general description of the shooter from a bar to a location approximately one-half block from the restaurant where the shooting occurred. This man told the driver that he would call back in a few minutes to be picked up again. After the driver made a loop around the block, the same man flagged him down and asked to be driven to 59 Salem Street. The man was picked up "around the time of the shooting." The taxicab stopped almost immediately at a red light, and the man told the driver to run it. When the driver refused to do so, the man spat on the floor of the taxicab several times in protest. The driver dropped the man off at 59 Salem

---

[3]The judge also concluded that, even if the search of the duffel bag were not incident to arrest, its suppression would still not be warranted because the contents of the duffel bag would inevitably have been discovered after the owner of the apartment had consented to a search of the apartment.

Street and saw him walk down the driveway, which led to the rear door of the house. There was no rear exit from the driveway.

Approximately ninety minutes after the shooting, a group of eight to eleven officers assembled near 59-61 Salem Street to locate and arrest the shooter. The house was a two-family home with two front doors that was owned by Alon. The door numbered 59 led upstairs to an apartment spanning the second and third floors; the other door, numbered 61, led to a first-floor apartment. The police first knocked on the door to the first-floor apartment. A man known as "Viejo" answered the door and let the officers inside. Viejo was occupying the first-floor apartment while he did renovation work before a new tenant moved in. The police conducted a protective sweep of the first-floor apartment and found no one else inside. They described the suspected shooter and asked Viejo if he had seen anyone who matched that description. He said that he had not, but noted that a person who matched that description stayed with the woman who lived in the upstairs apartment (Alon). The police then entered the basement and conducted a protective search, but did not find anyone. That left the upstairs apartment as the only part of the building that had not been searched.

Police officers then knocked on the door of the upstairs apartment, and Alon answered. After the police asked her if she had seen or heard anything unusual that evening, she asked them what they were doing there, told them that they had no right to be there, and asked if they had a search warrant. She told the officers that only she and her children were in the apartment and that the children were asleep. After officers heard a door slam and the sound of running coming from inside the upstairs apartment, the officers pushed Alon aside, entered the apartment, and ultimately found the defendant hiding under a bed in a spare bedroom on the third floor. The defendant was arrested, but was unarmed. After he was handcuffed and removed from the bedroom, the officers found a blue duffel bag containing ammunition inside the bedroom closet, approximately five to six feet from where the defendant had been found under the bed.

Alon told the officers that she did not know the defendant. Yet, at the motion to suppress hearing, she testified that the

defendant visited her several times a week at the upstairs apartment and had the run of the house when he was there, but was never given a key.

After the defendant was arrested, a State police lieutenant sought Alon's permission to search the house. He told her that she did not have to consent to the search, but that, if she did not, they would need to secure the house until a search warrant could be obtained. Alon asked to telephone a lawyer and made the call, but the lawyer did not answer. The State police lieutenant then presented Alon with a written "consent to search" form, which she signed, authorizing the search of her living quarters. The form declared that she had been informed of her constitutional right to refuse to allow a search without a search warrant. The tone of the conversation that preceded her signing of the consent form was "cordial," and Alon said that she did not care what the officers looked for, provided they did not make a mess. The judge found that Alon was "a highly intelligent, even shrewd woman" who consented to the search because, as she testified, she had nothing to hide. The judge did not credit Alon's testimony that the police threatened to notify the Department of Social Services (currently known as the Department of Children and Families) if she did not consent to the search.

The police returned the next day to search the first-floor apartment, where they "found a gun and other items." The defendant did not rent or occupy the first-floor apartment, never actually stayed there, and had not been given a key to the apartment by Alon. Because of his relationship with Viejo, the defendant felt comfortable entering the first-floor apartment without knocking, but he was "at best . . . an occasional, temporary visitor to the apartment" and was not visiting when the search was conducted.

b. *Warrantless entry into second-floor apartment.* "Given the high value that our Federal and Massachusetts Constitutions assign to the warrant requirement, particularly in relation to a dwelling, we impose a heavy burden on the Commonwealth to justify every warrantless search: in the absence of consent, the Commonwealth must prove both probable cause to enter the dwelling and the existence of exigent circumstances" (footnote

omitted). *Commonwealth* v. *Tyree*, 455 Mass. 676, 684 (2010). In determining whether a warrantless search falls within the narrow exception of exigent circumstances, we consider "the circumstances in their totality," *Commonwealth* v. *Forde*, 367 Mass. 798, 801 (1975), and evaluate these circumstances as they were known to the officers at the time rather than "with the benefit of leisured retrospective analysis." *Tyree, supra* at 691, quoting *Commonwealth* v. *DeJesus*, 439 Mass. 616, 620 n.3 (2003). See *Forde, supra* at 802-803, and cases cited ("exigency of circumstances which develop unexpectedly is not diminished by the fact that in hindsight it appears that there would have been time to obtain a warrant").

We conclude that the police had probable cause to believe that the shooter was present at 59 Salem Street. At the time of the entry, the police knew that a man had walked into a Lawrence restaurant and shot another man, that a man who matched the general description of the shooter provided by eyewitnesses had told a taxicab driver to drop him off near the restaurant shortly before the shooting and said he would call again for a ride in a few minutes, that the same man again had hailed this taxicab near the restaurant shortly after the shooting and told the driver to take him to 59 Salem Street, and that the man had been in such haste that he told the driver to run a red light.

The defendant correctly points out the paucity of evidence at the suppression hearing regarding the physical description of the shooter: all that was offered was that the taxicab driver described his passenger as a "Hispanic male, short hair, average height, . . . with a black and white sweater," and that his description "generally matched" the description of the shooter given by the eyewitnesses at the restaurant. We recognize that, apart from the sweater, this physical description is far from singular, especially in the city of Lawrence. But our conclusion that there was probable cause to believe that the shooter was the passenger does not rest on the singularity of the physical description but on the circumstances and timing of the passenger's arrival to and departure from the scene of the crime; on the passenger's desire to flee the scene, as evidenced by his instruction to run a red light; and on the passenger's appearance being consistent with that described by the eyewitnesses.

There also was probable cause to believe that the shooter was in the upstairs apartment of 59-61 Salem Street when the entry occurred. The taxicab driver told the officers he dropped the passenger off at that address and saw the man walking up the driveway, which was a dead end to which the building was the "only egress." After entering the downstairs apartment (with Viejo's consent), the officers determined that the defendant was not on the first floor or in the basement, leaving the upstairs apartment as the only area that had not been searched. Further, Viejo told the officers that a man fitting the suspect's general description stayed with the owner of the upstairs apartment. Finally, after Alon told the police that only she and her sleeping children were present in the upstairs apartment, officers heard a door slam and someone running.

In *Tyree*, 455 Mass. at 684, we rejected the proposition that "exigent circumstances *always* justify a warrantless entry and search in the aftermath of a crime involving a firearm where the police have reason to believe (i.e., probable cause) that an armed suspect is in a particular place, even in circumstances where it is not impracticable to obtain a warrant" (emphasis in original). Rather, even where there is probable cause, a warrantless entry is only justified by exigent circumstances where the police have reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances because the delay in doing so would pose a significant risk that the suspect may flee, evidence may be destroyed, or the safety of the police or others may be endangered. See *id.* at 685-692; *Commonwealth* v. *Moran*, 370 Mass. 10, 12 (1976). Although these risks need not all be present for there to be exigent circumstances, each was present here.

As to the risk of flight, approximately ninety minutes earlier, the shooter had walked into a restaurant without any mask or disguise, shot a patron, ran outside, hailed a taxicab, and told the driver to take him to 59 Salem Street. Consequently, there were reasonable grounds to believe that the shooter recognized that the police may come to that address looking for him once they located the taxicab driver who drove him there, and that the shooter would soon attempt to flee that address to elude arrest. Contrast *Tyree*, 455 Mass. at 687 (no evidence of risk of

flight where armed robbers were masked and had no reason to believe victim recognized them or that anyone had followed them).

As to the risk of destruction of evidence, the motion judge correctly noted that the "sophistication of forensics now renders virtually any aspect of a suspect's person or clothing a potential gold mine of evidence, yet that gold mine could have been negated given sufficient time on the part of the suspect to do so." Gunshot residue could have been washed from his hands or clothes. The victim's blood, if it had touched the shooter's clothing, could be washed away by cleaning the shooter's clothes. Where the shooter reasonably would have feared that he would be recognized by an eyewitness to the shooting, he had every incentive to eliminate any forensic link to that shooting and the police had reasonable grounds to believe that time was of the essence to prevent him from doing so. Contrast *id.* at 685-687 (no reason to believe that stolen money would be removed from apartment or that suspects had any incentive to remove or destroy clothing or masks used in robbery).

As to the risks to the safety of the police and others, the motion judge correctly noted that the police "knew that a hot-headed gunman was in the apartment and was still in possession of a weapon." Where the police knew that others, including children, were in the apartment, the motion judge concluded:

> "To conduct a siege of the apartment while awaiting the arrival of a search warrant would permit the suspect to take hostages and set up a defensive position that would create conditions even more dangerous than would exist in the event that an immediate assault were undertaken. It was wisest to pursue the [d]efendant immediately while he was likely to be off balance."

Given that an armed suspect had just shot someone under these circumstances, we agree that the police had reasonable grounds to fear that the delay inherent in obtaining a warrant would have increased the danger to the police and to the residents of the apartment. Contrast *id.* at 688-690 & n.28 (no safety risk where suspects were not "on the run," and no evidence to suggest that suspects were likely to engage in violence to avoid

capture or were even aware of officers' presence outside residence).

Because there was probable cause to believe that the shooter was in the upstairs apartment, and because there were reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances where taking the time to do so would have posed a significant risk that the suspect may flee, evidence may be destroyed, or the safety of the police or others may be endangered, we conclude that the judge did not err in finding that the warrantless entry into the apartment was justified by exigent circumstances.

c. *Seizure of ammunition in duffel bag.* The defendant contends that, even if the entry was lawful, the seizure of the ammunition in the duffel bag in the bedroom where the defendant was arrested was not. The motion judge concluded that the seizure was justified as the result of a search incident to arrest because the ammunition was found in an area "within [the defendant's] immediate reach." The defendant argues that this was error because he already had been handcuffed and taken out of the room when the ammunition was found. We agree with the motion judge that the ammunition was properly seized as the result of a search incident to arrest.

The geographic scope of a lawful search incident to arrest is the area within the defendant's "immediate control" *at the moment of arrest,* that is, "the area within which he might gain possession of a weapon or destructible evidence." *Commonwealth* v. *Elizondo,* 428 Mass. 322, 323-324 (1998), quoting *Chimel* v. *California,* 395 U.S. 752, 763 (1969). We do not measure its scope by the "grab area" *at the time of the search,* when the defendant may have been restrained or handcuffed. *Elizondo, supra* at 324 n.3. Measuring the "grab area" at the time of the search would compromise the safety of arresting officers because it would require them to seize all evidence within the arrestee's immediate control *before* securing the arrestee in order to make lawful the search incident to arrest. See *Commonwealth* v. *Netto,* 438 Mass. 686, 695 (2003), quoting *United States* v. *Nelson,* 102 F.3d 1344, 1347 (4th Cir. 1996), cert. denied, 520 U.S. 1203 (1997) (officers "need not reorder the sequence of their conduct during arrest simply to satisfy an artificial rule that

would link the validity of the search to the duration of the risks"). Instead, they may secure the arrestee and then safely search the area within his immediate control at the moment of arrest. See *Netto, supra* at 696 ("That the officers handcuffed the defendants and removed them from the room [for obvious purposes of officer safety] should not preclude them from seizing those same items immediately following the removal of the defendants").[4]

d. *Seizure of firearm and ammunition in first-floor apartment.* We also agree with the motion judge that the defendant did not have standing to seek suppression of the firearm and ammunition seized the next day in the first-floor apartment. The defendant was not charged with a possessory offense regarding the firearm or ammunition, so he does not have automatic standing to challenge its seizure. See *Commonwealth* v. *Mubdi*, 456 Mass. 385, 392 (2010). Nevertheless, he would have standing to challenge the seizure of evidence from the first-floor apartment if he had a reasonable expectation of privacy in that apartment. See *Rakas* v. *Illinois*, 439 U.S. 128, 138-139, 143 (1978); *Commonwealth* v. *Mora*, 402 Mass. 262, 265 (1988). The defendant argues that he had such an expectation of privacy because the evidence at the motion hearing showed he was entitled to freely enter the first-floor apartment without knocking. Where the defendant was not an overnight guest but was "at most, an occasional visitor to the [first-floor] apartment who happened to enter without knocking on some occasions," the defendant does not have standing to challenge the search of that apartment. See *Minnesota* v. *Olson*, 495 U.S. 91, 99-100 (1990) (recognizing overnight guest's legitimate expectation of privacy in host's apartment); *Rakas, supra* at 142-148 (rejecting "legitimately on premises" standard as overly broad for standing); *Mora, supra* (defendant "did not claim to be the tenant, to have lived in the apartment at any time, or to have been present at the time of the search," and, thus, lacked standing to challenge warrantless entry into apartment).

---

[4]We also agree with the motion judge that, even if the seizure were not lawful as the result of a search incident to arrest, the evidence properly was not suppressed because Nancy Alon subsequently voluntarily consented to a search of her apartment, and the ammunition would inevitably have been discovered during that search. See *Nix* v. *Williams*, 467 U.S. 431, 444 (1984).

2. *Motion to suppress showup identification.* Carlos Paulino was an eyewitness to the shooting and reported it that night to the Lawrence police department. He gave police a physical description of the shooter, and later identified the defendant as the shooter during a one-on-one (showup) identification procedure. The defendant moved to suppress Paulino's identification, claiming that it was impermissibly suggestive. After an evidentiary hearing, a different motion judge (who was later the trial judge) denied the motion. We conclude that the judge did not err in doing so.

A showup identification is disfavored because it is inherently suggestive, but it violates due process only where the defendant proves by a preponderance of the evidence that it is "*unnecessarily* suggestive." *Commonwealth* v. *Phillips*, 452 Mass. 617, 627-628 (2008), quoting *Commonwealth* v. *Martin*, 447 Mass. 274, 279 (2006). A showup identification is unnecessarily suggestive where there was not "good reason" for the police to conduct it under the circumstances. *Phillips*, *supra* at 628, quoting *Martin*, *supra*. We regularly conclude that there is good reason for a showup identification where an eyewitness is shown a suspect promptly after the commission of the crime. *Phillips*, *supra*. Not only is a prompt identification procedure more likely to be accurate, because the eyewitness's memory is fresh, but also, more importantly, it allows the police to learn quickly whether the suspect is the perpetrator of the crime so that, if he is not, the police can continue the investigation to find the actual perpetrator. See *id.* at 629. Even where there is "good reason" for a showup identification, it may still be suppressed if the identification procedure so needlessly adds to the suggestiveness inherent in such an identification that it is "conducive to irreparable mistaken identification." *Id.* at 628, quoting *Martin*, *supra* at 279-280.

The motion judge here found that approximately two and one-half hours after the shooting (and approximately one hour after the defendant's arrest), Paulino was brought to the street outside 59 Salem Street for a showup identification of the defendant. The police told him that they wanted to show him someone regarding the shooting, and that he should let them know whether he could identify the person. While sitting in an unmarked

police cruiser, Paulino saw the defendant and identified him without hesitation as the shooter. At the time, the defendant was standing near a police transport van, was flanked on either side by a police officer in plain clothes, and had his hands cuffed behind his back. The judge recognized that "the showup [was] plainly suggestive" but concluded that there was a permissible purpose for it: the need quickly to confirm that the person arrested was the shooter and that the real shooter was not at large.

We agree that, under these circumstances, there was good reason to conduct a showup identification, and that the procedure, although inherently suggestive, was not so unnecessarily suggestive that it created a substantial risk of a mistaken identification. See *Commonwealth* v. *Meas*, 467 Mass. 434, 441 (2014) (police had "very good justification for resorting to . . . showup procedure" where crime involved use of firearm not recovered at scene). The passage of approximately two and one-half hours since the shooting did not dissolve the public safety justification for the showup. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 479 (1980) (showup identification conducted approximately two hours after murder admissible); *Commonwealth* v. *Perretti*, 20 Mass. App. Ct. 36, 37-38, 41 (1985) (showup identification admissible where victim identified defendant over two hours after incident). Accordingly, the motion to suppress the identification was properly denied.

3. *Reasonable doubt instruction.* In his final instructions to the jury, the judge departed from the reasonable doubt instruction crafted from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850),[5] that generally is used in criminal cases in Massachusetts, and instead gave an instruction taken from Instruction 21 of the

---

[5]The reasonable doubt instruction modeled on *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), states:

"The burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charge[s] made against [him].

"What is proof beyond a reasonable doubt? The term is often used and probably pretty well understood, though it is not easily defined. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt. A charge is proved beyond a reasonable doubt if, after you have compared and considered all of the evidence,

Federal Judicial Center's Pattern Criminal Jury Instructions (1987).[6] There are various differences between these two instructions, but the primary one is that, to find a defendant guilty,

> you have in your minds an abiding conviction, to a moral certainty, that the charge is true.
>
> "I have told you that every person is presumed to be innocent until [he] is proved guilty, and that the burden of proof is on the Commonwealth. If you evaluate all the evidence and you still have a reasonable doubt remaining, the defendant is entitled to the benefit of that doubt and must be acquitted.
>
> "It is not enough for the Commonwealth to establish a probability, even a strong probability, that the defendant is more likely to be guilty than not guilty. That is not enough. Instead, the evidence must convince you of the defendant's guilt to a reasonable and moral certainty; a certainty that convinces your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence. That is what we mean by proof beyond a reasonable doubt."

Massachusetts Superior Court Criminal Practice Jury Instructions § 1.1.2 (Mass. Cont. Legal Educ., 2d ed. 2013).

[6] The judge's reasonable doubt instruction was as follows:

> "The burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charge made against him, the charge here is first degree murder.
>
> "What is proof beyond a reasonable doubt? The term is often used and is probably pretty well understood by jurors, but, ladies and gentlemen, it is not easy for [j]udges to define it to jurors.
>
> "Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt.
>
> "On the other hand, it is not enough for the Commonwealth to establish a probability, even a strong probability, that the defendant is more likely to be guilty than not guilty, that is not enough. . . .
>
> "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases, the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty.
>
> "If on the other hand, you think there is real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty. This is what we mean by proof beyond a reasonable doubt."

Instruction 21 requires the jury to be "firmly convinced that the defendant is guilty of the crime charged," while the *Webster* instruction requires the jury to have "an abiding conviction, to a moral certainty, that the charge is true." See *id.* The defendant argues that the instruction given by the judge diminished the required burden of proof, and therefore violated his right to due process under art. 12 of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution. Because the defendant did not object to the reasonable doubt instruction at trial, we review whether the alleged error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Denis*, 442 Mass. 617, 621 (2004).

"[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Commonwealth* v. *Pinckney*, 419 Mass. 341, 342 (1995), quoting *Victor* v. *Nebraska*, 511 U.S. 1, 5 (1994). Rather, we look to whether the reasonable doubt instruction adequately impressed on the jury "the need to reach a subjective state of near certitude of the guilt of the accused." *Victor*, *supra* at 15, quoting *Jackson* v. *Virginia*, 443 U.S. 307, 315 (1979). "In reviewing a reasonable doubt instruction, we consider whether there is a 'reasonable likelihood' that the instruction led the jury to believe that they could convict the defendant on proof insufficient to dispel reasonable doubt." *Denis*, *supra* at 621, quoting *Pinckney*, *supra*.

We have cited but not indorsed Instruction 21, see *Commonwealth* v. *Therrien*, 428 Mass. 607, 611 n.5 (1998), as an alternative to the "moral certainty" instruction that passes constitutional muster only where supplemented with another instruction that impresses on a jury "the need to reach a subjective state of near certitude of the guilt of the accused." *Id.* at 610, quoting *Pickney*, *supra* at 344. Justice Ginsburg in her concurrence in *Victor*, *supra* at 26-27, described Instruction 21 as "clear, straightforward, and accurate," and declared that it surpassed other model reasonable doubt instructions "in stating the reasonable doubt standard succinctly and comprehensibly." The phrase "firmly convinced" has been described as a correct and adequate statement of the reasonable doubt standard by the United States Court of Appeals for the Fifth and Tenth Circuits,

see *United States* v. *Conway*, 73 F.3d 975, 980 (10th Cir. 1995) ("firmly convinced," along with instruction that jury must acquit if "real possibility" that defendant not guilty, "is a correct and comprehensible statement of the reasonable doubt standard"); *United States* v. *Hunt*, 794 F.2d 1095, 1100-1101 (5th Cir. 1986) (upholding "firmly convinced" instruction), and the United States Court of Appeals for the First Circuit, although critical of Instruction 21, has not found the use of the instruction to constitute plain error. See, e.g., *United States* v. *Woodward*, 149 F.3d 46, 69 n.15 (1st Cir. 1998), cert. denied, 525 U.S. 1138 (1999).

We leave for another day the question whether the judge's instruction communicated the requirement of "near certitude" of guilt to a jury as effectively as the model reasonable doubt instruction adapted from *Webster, supra* at 320.[7] We conclude here simply that the judge's reasonable doubt instruction did not create a substantial likelihood of a miscarriage of justice because there is not a reasonable likelihood that the judge's instruction caused the jury to believe that they could convict the defendant on something less than proof beyond a reasonable doubt.

4. *Intoxication instruction.* The crux of the defendant's argument to the jury was that the defendant was so intoxicated at the time of the shooting that he was unable deliberately to premeditate the killing or to form an intent to kill. The judge instructed the jury as follows on the issue of intoxication:

> "[Y]ou may consider any credible evidence . . . of the defendant's consumption of alcohol or narcotics on the issues of whether the defendant possessed an intent to kill, or whether he accomplished the killing after deliberate premeditation. . . . The Commonwealth, however, does not need to prove that the defendant was sober or not intoxicated, that is not the Commonwealth's burden of proof. They don't have to prove that he was not intoxicated.

---

[7]We have granted direct appellate review of a criminal case where the same reasonable doubt instruction of this same judge was timely objected to at trial and therefore is subject to review for prejudicial error. See Commonwealth *vs.* Russell, No. SJC-11602. We need not consider here whether it is prejudicial error to give this instruction.

> People who are intoxicated still may be able to form an intent to do something, and then decide to accomplish that goal. The Commonwealth, however, must prove to you beyond a reasonable doubt that the defendant was not so intoxicated that he was unable to deliberately premeditate or form the necessary intent for malice."

The defendant contends that the judge's instruction that the Commonwealth need not prove that the defendant "was sober" was not only confusing but "unconstitutionally diluted the Commonwealth's burden of proof on proving deliberate premeditation and malice aforethought." He also contends the judge's statement that "[p]eople who are intoxicated still may be able to form an intent to do something" was an improper comment not based on the evidence. Because the defendant timely objected to the judge's instruction, we review it under the prejudicial error standard. See *Commonwealth* v. *Szlachta*, 463 Mass. 37, 45 (2012).

We conclude that the instruction was not erroneous. Where a defendant claims diminished capacity because of intoxication, the Commonwealth is required to prove only that the defendant was not so intoxicated that he was incapable of forming the requisite intent. See *Commonwealth* v. *Herbert*, 421 Mass. 307, 316 (1995) (intoxication instruction warranted where "evidence raised a reasonable doubt whether the defendant was so intoxicated at the time of the incident that he was incapable of forming the intent that is a necessary element of the crimes charged"). "[T]he Commonwealth does not have to prove that the defendant was not intoxicated." *Commonwealth* v. *Vasquez*, 419 Mass. 350, 353 (1995), citing *Commonwealth* v. *Costello*, 392 Mass. 393, 404-405 (1984). Nor did the judge improperly comment on the potential capacity of persons who are intoxicated to form an intent. Where a judge properly instructs that the Commonwealth must prove that the defendant was not "so intoxicated" that he was unable to form an intent, it is implicit that a person less intoxicated may be capable of forming an intent.

5. *Tuey-Rodriquez instruction.* After approximately ten hours of deliberation over three days, the jury sent the following note to the judge: "If the [jury] cannot agree on first degree murder

(i.e. some feel it is first degree, some feel it is second degree), are we a hung jury or do we move on to consideration re: second degree murder?" After conferring with counsel, the judge told the jury, "[Y]ou are at this point a hung jury if on this issue of first degree murder you cannot agree," explaining that "a hung jury is when the jury [are] deadlocked after due and thorough deliberations." The judge then gave the *Tuey-Rodriquez* instruction, but only "in regards to [their] consideration of first degree murder." A reasonable jury listening to this instruction would have understood that, if they were unable to reach a verdict with respect to murder in the first degree, a mistrial would be declared, and the case would need to be retried before another jury.[8] The defendant argues that the *Tuey-Rodriquez* instruction should not have been given and that it had a coercive effect on the jury that resulted in his conviction of murder in the first degree. Because the defendant did not object to the instruction, we determine if it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Gonzalez*, 465 Mass. 672, 684-685 (2013).[9]

---

[8]The judge intended to communicate this message to the jury. He told counsel that, as a matter of law, the jury could not consider murder in the second degree unless and until they reached unanimous agreement that the defendant was not guilty of murder in the first degree. The judge also warned counsel that, if the jury were unable to reach unanimous agreement as to murder in the first degree, the consequence would be a hung jury and a mistrial.

The judge instructed the jury:

"You should consider that it is desirable that this case be decided; that you were selected in the same manner and from the same source from which any future jury must be. And there is no reason to suppose that this case will ever be submitted to twelve persons more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other."

The judge asked "jurors for not guilty on first degree murder" to "consider whether a doubt in their own minds is a reasonable one which makes no impression on the minds of others equally honest, equally intelligent with themselves," and "jurors for guilty on first degree murder" to "ask themselves whether they [may] not reasonably doubt the correctness of a judgment which is not concurred in by others."

[9]Defense counsel initially suggested that the judge answer the jury's question by telling them "to move on to second degree murder," but he later agreed with the judge's decision to give a *Tuey-Rodriquez* instruction and made no objection when it was given.

The jury's simple question requires us to answer a difficult question of law: where a jury are permitted to consider lesser included offenses, does Massachusetts adopt the "acquittal first" rule, the "soft transition" rule, or the "reasonable efforts" variation on the "soft transition" rule? Under the "acquittal first" rule, sometimes described as the "hard transition" rule, a jury are instructed that they must deliberate first regarding the most serious offense charged, and may not consider a lesser offense unless and until they unanimously find the defendant not guilty of the greater charge. See *Commonwealth* v. *Roth*, 437 Mass. 777, 794 n.14 (2002). See also *State* v. *Tate*, 256 Conn. 262, 279-280 & n.12 (2001); *People* v. *Boettcher*, 69 N.Y.2d 174, 179 (1987). Under the "soft transition" rule, a jury are instructed that they may move on to consider the lesser offense if they do not find the defendant guilty of the greater offense. See *Roth, supra*; *People* v. *McGregor*, 635 P.2d 912, 914 (Colo. App. 1981). See also Federal Judicial Center, Pattern Criminal Jury Instructions, Instruction 48 (1987) (if, after considering greater offense, "your verdict on that crime is not guilty or if you are unable to reach a verdict on it, you should consider whether the defendant has been proved guilty of [lesser crime]"). The "reasonable efforts" rule is a variation on the "soft transition" rule in which the jury are instructed to move on to consider a lesser offense if, after all reasonable efforts, they are unable to reach agreement as to the greater offense. See *United States* v. *Jackson*, 726 F.2d 1466, 1469 (9th Cir. 1984); *United States* v. *Tsanas*, 572 F.2d 340, 346 (2d Cir.), cert. denied, 435 U.S. 995 (1978); *State* v. *Labanowski*, 117 Wash. 2d 405, 419 (1991).[10] The choice of rule has significant consequences as to how a jury deliberate in a criminal case where they are permitted to consider lesser offenses as to a single charge, and may affect their ultimate verdict.

We have declared, albeit in dicta, that Massachusetts is not

---

[10]Several courts have held that, where an instruction on a lesser included offense is appropriate, a judge may give either the "acquittal first" or "reasonable efforts" instruction if the defendant does not state a preference but that, if the defendant requests one of these instructions, it is error for the judge not to honor the request. See *United States* v. *Jackson*, 726 F.2d 1466, 1469 (9th Cir. 1984); *Catches* v. *United States*, 582 F.2d 453, 459 (8th Cir. 1978); *United States* v. *Tsanas*, 572 F.2d 340, 346-347 (2d Cir.), cert. denied, 435 U.S. 995 (1978).

an "acquittal first," or "hard transition," jurisdiction, "as we give juries free rein to conduct their deliberations as they see fit." *Roth*, 437 Mass. at 794 n.14. Although, "[w]hen presented with the option of lesser included offenses, our juries are told that if they find the defendant guilty, they must return a verdict of guilty of the highest crime that has been proved beyond a reasonable doubt. . . . [N]othing in such an instruction dictates the manner or order in which the jury decide to organize their discussion" (citation omitted). *Id.* We reiterate here that Massachusetts is a "soft transition" jurisdiction, and we reject the "acquittal first" rule.

The "acquittal first" rule significantly increases the risk of a mistrial, because "a jury unable either to convict or acquit on the greater charge will not be able to reach a lesser charge on which it might have been able to agree." *Tsanas*, 572 F.2d. at 346. See, e.g., *Blueford* v. *Arkansas*, 132 S. Ct. 2044, 2049 (2012) (colloquy between judge and foreperson in "acquittal first" jurisdiction revealed jury had, at that point in deliberations, agreed to acquit defendant of capital and first-degree murder but were deadlocked as to manslaughter, and, as a result, had not moved on to another lesser included offense). Alternatively, under the "acquittal first" rule, dissenting jurors might agree to convict the defendant as charged because they recognize that the jury's inability to reach unanimity on the greater charge will prevent them from convicting the defendant of any lesser included offense and require a retrial. See *Jackson*, 726 F.2d at 1470 ("the risk [is] substantial that jurors harboring a doubt as to defendant's guilt of the greater offense but at the same time convinced that defendant had committed some offense might wrongly yield to the majority and vote to convict of the greater offense rather than not convict defendant of any offense at all"); *Tsanas, supra* ("[i]f the jury [are] heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge"). Cf. *Commonwealth* v. *Woodward*, 427 Mass. 659, 664-665 (1998), citing *Commonwealth* v. *Walker*, 426 Mass. 301, 305 (1997) (doctrine favoring instructing juries on lesser

included offenses "serves the public purpose of allowing the jury to convict of the offense established by the evidence, rather than forcing them to choose between convicting the defendant of an offense not fully established by the evidence or acquitting, even though the defendant is guilty of some offense").

The "acquittal first" rule is also inconsistent with the requirement in Mass. R. Crim. P. 27 (a), 378 Mass. 897 (1979), that a jury's verdict in a criminal case be a "general verdict." "The term 'general verdict' refers to 'a verdict dispositive of the entire charge,' not just a portion of the charge." *Roth*, 437 Mass. at 787, quoting *A Juvenile* v. *Commonwealth*, 392 Mass. 52, 55 (1984). We said in *Roth*:

> "A lesser included offense is part of a single charge, not a separate 'charge' or separate 'offense.' A trial on a single complaint or indictment is not a trial on 'two or more offenses,' and the identification of applicable lesser included offenses at the time the case is submitted to the jury does not transform the trial into a trial on 'two or more offenses.' "

*Roth*, *supra*, quoting Mass. R. Crim. P. 27 (b). Therefore, a jury are not deadlocked where they can reach a general verdict that disposes of the entire charge, even if that means conviction of a lesser charge. Only where the jury fail to return a general verdict " 'dispositive of the entire charge,' not just a portion of the charge," are the jury hung. *Roth*, *supra*, quoting *A Juvenile*, *supra*.

The "acquittal first" rule requires the jury to deliberate as if they were furnished multiple verdict slips on a single indictment or complaint, with one slip reflecting the greater offense and another for each of the lesser included offenses, because they are instructed that they must first reach a verdict as to the greater offense and may render a verdict as to a lesser offense only if they reach a verdict of not guilty as to the greater offense. But our practice under rule 27 (a) is that "a single verdict slip accompanies the indictment or complaint, not a separate verdict slip for each lesser included offense." *Roth*, *supra*. "The jury cannot . . . 'file a verdict slip' with the clerk and then resume deliberations on remaining lesser included offenses that are

reflected on that same verdict slip." *Id.* at 788. Therefore, we have rejected "the taking of a verdict on anything less than the entirety of a single complaint or indictment, as that would not qualify as the 'general verdict' required by rule 27 (a)." *Id.* See *A Juvenile, supra* at 56 ("verdict as to part of the charge, where the jury are unable to agree on the remainder of the complaint," cannot constitute general verdict). Because judges may not accept a partial verdict where the jury find a defendant not guilty of the greater offense but are deadlocked as to a lesser offense, see *Roth, supra* at 794-795, so, too, should judges refrain from declaring a mistrial where the jury are unable to reach agreement as to the greater offense but may yet be able to achieve a general verdict. Contrast *State* v. *Tate*, 256 Conn. at 283, quoting *State* v. *Sawyer*, 227 Conn. 566, 583 (1993) (noting that, unlike "soft transition" jurisdictions, a number of "hard transition" States accept partial verdicts because jury have "confronted and completed" determination with respect to greater offense before moving on to lesser included offenses).

Under the "soft transition" rule, the jury are instructed to move on to consider a lesser included offense where they did not find the defendant *guilty* of the greater offense rather than being required to find the defendant *not guilty* of the greater offense before moving on to the lesser included offense. While this instruction will suffice before the jury commence their deliberations, a "reasonable efforts" instruction should be given where the jury during deliberations announce their deadlock as to the greater offense because it ensures the jury will honor the instruction that the jury "have a duty to find the defendant guilty of the most serious offense that the Commonwealth has proved beyond a reasonable doubt." Model Jury Instructions on Homicide 93 (2013). A reasonable efforts instruction informs the jury that if, after all reasonable efforts, they reach agreement that the defendant is *not* guilty of the greater offense or are unable to agree as to the greater offense, they may consider whether the defendant is guilty of a lesser offense. See, e.g., *Pharr* v. *Israel*, 629 F.2d 1278, 1281 n.1 (7th Cir. 1980), cert. denied, 449 U.S. 1088 (1981); *Tsanas*, 572 F.2d at 346.

We recognize that the "soft transition" rule means that a jury

may not unanimously have agreed to acquit a defendant of a greater offense when they find a defendant guilty of a lesser offense. But, under the Federal constitutional prohibition against double jeopardy, the conviction of a lesser offense is treated as an implied acquittal of the greater offense, and the defendant cannot be retried on the greater offense where the conviction on the lesser offense is vacated on appeal. See *Green* v. *United States*, 355 U.S. 184, 191 (1957) ("we believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree' "). See also *Price* v. *Georgia*, 398 U.S. 323, 329 (1970) ("this Court has consistently refused to rule that jeopardy for an offense continues after an acquittal, whether that acquittal is express or implied by a conviction on a lesser included offense when the jury was given a full opportunity to return a verdict on the greater charge"); *Commonwealth* v. *Acevedo*, 446 Mass. 435, 451 n.20 (2006) (defendant "effectively was acquitted" of murder in first degree when jury returned conviction of murder in second degree and, accordingly, could not be retried on greater offense). Our reaffirmance of the "soft transition" rule will not affect this double jeopardy protection because the United States Supreme Court did not rest its conclusion that double jeopardy bars prosecution of the greater offense on the jury having been instructed in accordance with the "acquittal first" rule. See *Green, supra.*

Because we have rejected the "acquittal first" rule, the judge erred in telling the jury that they were a hung jury if they could not reach agreement on murder in the first degree, and in furnishing them with a *Tuey-Rodriquez* instruction that suggested that a failure to reach agreement on murder in the first degree would result in a mistrial. Instead, after receiving the jury's note that they were deadlocked as to murder in the first degree, the judge should have instructed the jury that they were not a hung jury and that if, after all reasonable efforts, they were unable to reach agreement as to murder in the first degree (or if they reached agreement that the defendant was *not* guilty of murder

in the first degree), they should move on to consider murder in the second degree.[11]

Where the defendant did not object to the judge's instruction, we evaluate the error to determine whether it created a substantial likelihood of a miscarriage of justice. Under that standard, "a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). In the unusual circumstances of this case, we are not substantially confident that the jury would have returned a verdict of murder in the first degree if they had received the correct instruction. Where the defendant effectively conceded guilt with respect to murder in the second degree, acquittal was merely a theoretical possibility; the only real issue before the jury was the degree of murder. The jury had struggled with that issue for approximately ten hours over three days of deliberations, and had asked the judge several legal questions regarding premeditation and malice before asking whether they were a hung jury. If the jury had received the correct instruction, it is reasonably likely that they would have moved on to consider murder in the second degree, believing that they had exhausted all reasonable efforts to reach agreement as to murder in the first degree. Nor can we be substantially confident that the judge's erroneous instruction did not cause the hold-out juror or jurors to "throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all," especially where the defendant admitted that he shot the victim. *Tsanas*, 572 F.2d at 346. Therefore, we reverse the defendant's conviction of murder in the first degree.

A jury that by its verdict has found that the prosecution has

---

[11]The judge was not alone in making this error. We erred in our Model Jury Instructions on Homicide 36 (2013), in providing that, where the jury are to be instructed on voluntary or involuntary manslaughter, the jury may be told, "If you find the defendant not guilty of murder in the first degree or murder in the second degree, you shall consider whether the Commonwealth has proved the defendant guilty beyond a reasonable doubt of the lesser offenses of voluntary manslaughter or involuntary manslaughter." The instruction instead should read, "If you do not find the defendant guilty of murder in the first degree or murder in the second degree, you shall consider whether the Commonwealth has proved the defendant guilty beyond a reasonable doubt of the lesser offenses of voluntary manslaughter or involuntary manslaughter."

proven beyond a reasonable doubt the elements of murder in the first degree necessarily also finds that the prosecution has proven the elements of the lesser included offense of murder in the second degree. We are absolutely confident that the judge's erroneous instruction did not infect the jury's verdict to the extent they also found the defendant guilty of murder in the second degree. Were we to conclude that a conviction of murder in the second degree was more consonant with justice, we would exercise our authority under G. L. c. 278, § 33E, and order that the case be remanded to the Superior Court for entry of a verdict of guilty of murder in the second degree. But we do not reach that conclusion. Rather, we conclude that the interests of justice are better served by remanding the case to the Superior Court, and allowing the Commonwealth to choose between entry of a verdict of murder in the second degree or retrial of the defendant on the charge of murder in the first degree. See *Commonwealth* v. *Bell*, 460 Mass. 294, 309-310 & n.24 (2011).

*Conclusion.* The defendant's conviction of murder in the first degree is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*