NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11652

COMMONWEALTH vs. ANTHONY L. MOORE, JR.

Hampden.     May 11, 2018. - October 31, 2018.

Present: Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.

Homicide. Felony-Murder Rule. Armed Home Invasion. Robbery.
    Assault and Battery by Means of a Dangerous Weapon.
    Firearms. Evidence, Third-party culprit, Hearsay,
    Relevancy and materiality, Identification, Unavailable
    witness, Testimony at prior proceeding, Testimony before
    grand jury, Impeachment of credibility, Exculpatory.
    Identification. Witness, Unavailability, Impeachment.
    Practice, Criminal, Preservation of evidence, New trial,
    Assistance of counsel, Capital case.


    Indictments found and returned in the Superior Court
Department on April 16, 2010.

    The cases were tried before John S. Ferrara, J., and a
motion for a new trial, filed on December 24, 2015, and
supplemented on January 25, 2017, was heard by him.


    Russell C. Sobelman for the defendant.
    Shane T. O'Sullivan, Assistant District Attorney, for the
Commonwealth.


    LOWY, J. On the evening of March 22, 2010, Margaret

Przewozniak was shot, execution style, by a masked gunman during

an armed robbery and home invasion in Springfield. A Hampden County grand jury returned indictments charging the defendant, Anthony L. Moore, Jr., with murder and various related offenses. At trial, the defendant pursued a misidentification defense and attempted to undermine the procedures employed by the Springfield police. A Superior Court jury convicted the defendant of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder with armed home invasion and armed robbery as the predicate felonies.[1]

On appeal from his convictions and from the denial of his motion for a new trial, the defendant claims error in (1) the exclusion of evidence pertaining to the inadequacy of the police investigation; (2) the Commonwealth's failure to preserve and disclose exculpatory evidence; (3) the conduct of a showup identification procedure; (4) the admission of the prior testimony of an unavailable witness, and (5) error in the denial of his motion for a new trial. The defendant also argues that we should exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdict for a myriad of reasons.[2] We find no reversible error, and we discern no basis

---

[1] The defendant also was convicted of nine related offenses.

[2] The defendant submitted two appellate briefs; one in support of his direct appeal and one in support of his appeal

to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.  We therefore affirm the judgments and the denial of his motion for a new trial.

Background.  We summarize the facts the jury could have found, reserving certain details for our discussion of the specific issues raised on appeal.

In March, 2010, Sarah LaPalm lived with her three year old child and the victim in a two-bedroom apartment in Springfield. LaPalm and her child occupied the two bedrooms on the second floor of the apartment, and the victim occupied a bedroom in the basement.  The victim sold cocaine and marijuana, and she kept large sums of money in various denominations in a small keyed strongbox in the basement.

Sometime after 9 P.M. on March 22, 2010, LaPalm, the child, and the victim were in the kitchen of their apartment when a

---

from the trial judge's denial of his motion for a new trial. Together, the briefs assert numerous claims of error, some of which are barely comprehensible and lack compliance with our rule governing appropriate appellate argument.  Mass. R.A.P. 16 (a) (4), as amended, 367 Mass. 921 (1975).  See Commonwealth v. Cassidy, 470 Mass. 201, 209 n.9 (2014) (arguments unsupported by "individual legal analysis or citation to the relevant legal authority" are insufficient under rule 16); Kellogg v. Board of Registration in Med., 461 Mass. 1001, 1003 (2011) ("Briefs that limit themselves to 'bald assertions of error' that 'lack[] legal argument . . . [do not] rise[] to the level of appellate argument' required by rule 16").  However, we have reviewed all his claims of error under our obligation pursuant to G. L. c. 278, § 33E; none requires relief.

masked African-American man carrying a gun entered the home. The intruder was dressed in black and wore a ski mask covering his face; he was approximately six feet tall and slim.[3] The victim pulled down the intruder's mask, exposing part of his face, and said, "What is this a joke? We went to school together." In response, the intruder pointed the gun at LaPalm's child and said, "This shit is serious. Your [child]'s right there." He then fired a bullet into the kitchen floor.

LaPalm immediately picked up her child and ran out the back door to her neighbor's apartment, where she telephoned 911. As LaPalm ran, she looked back into her kitchen and saw the victim struggling with the intruder, who was dragging the victim toward the basement. LaPalm also saw a second man standing at the foot of the stairs outside her apartment. He was approximately five feet, six inches tall, was dressed in black, and was wearing a ski mask.

As LaPalm fled, a neighbor, Charles Brown, was arriving home. He pulled into his driveway, saw LaPalm banging on his front door, and heard her "screaming," "There [are] two masked guys in my house." Moments later, Brown saw two men wearing masks and dressed in all black leave LaPalm's apartment. One of

---

[3] According to the record, at the relevant time, the defendant was approximately six feet, two inches tall and weighed approximately 240 pounds. The defendant was twenty-three years old at the time of the crime.

the men was shorter than the other, approximately five feet, six inches tall; the other was over six feet tall and thin. The two men ran past Brown's motor vehicle toward a light colored minivan. One of the men was carrying a black box. Although he was unable to see either perpetrator's face, Brown believed that he saw the hands of both men and concluded that they were African-American.

LaPalm also watched the masked men run through the parking lot. She noticed that the taller intruder was carrying the victim's strongbox. LaPalm then returned to her apartment, where she found the victim in the basement, curled up in a fetal position and moaning. The victim had suffered two gunshot wounds, one to the front of her left thigh and one to the back of her head. Gunshot residue indicated that the muzzle of the gun had been pressed near or against the victim's head when she was shot. The murder weapon was not recovered.

Officers who responded to the scene that evening learned from college students who lived in a house next to the apartment complex that, at about 9:15 P.M., one of them saw two African-American men walking out of his backyard. One of the men was about six feet, three inches tall and weighed over 200 pounds. The other was approximately five feet, nine inches tall and skinny. Both men appeared to be between eighteen and twenty-four years old and were wearing black hooded sweatshirts and

black winter hats.  He asked the two men, "What's going on?" The taller man responded, "We're hiding out in your backyard." The witness went back inside and told his two roommates what he had observed, and they all went outside.  From the front porch they observed two African-American men walking towards LaPalm's apartment complex.  When one of the students asked the two men what they were doing, the taller man responded, "Do you have a problem?"  The three said, "No," and went back inside their house.

In addition, an officer spoke with a woman and her young teenaged daughter, who lived in a house down the street from LaPalm's apartment complex.  The woman said that as she and her daughter left their house shortly after 9 P.M. to go grocery shopping, she noticed a gray minivan she did not recognize from the neighborhood parked directly in front of her driveway.  She also did not recognize either of the vehicle's two occupants, both of whom were wearing black hooded sweatshirts.  After she saw the two men leave the vehicle and run into her neighbor's backyard, the woman instructed her daughter to write down the vehicle's registration number on a piece of paper.  She also noticed white lettering on the top of the vehicle's windshield.

As a result, an officer issued a radio broadcast that police officers should be on the lookout for a minivan with the registration number that the woman had provided.  Because police

were unable to find a matching vehicle in the registry of motor vehicles database, police tried a different combination of the letters and numbers that the woman had provided, and were able to match a registration number that was different by one digit to the license plate number of a vehicle matching witness descriptions.[4]

Officers learned that the license plate number was associated with a gray Dodge minivan that was registered to the defendant's mother.  They went to the address in Springfield but did not locate the vehicle.  However, at approximately 11:30 P.M., the same officers observed a gray Dodge minivan with the applicable registration number idling on a street in Springfield.  The officers could see two men in the vehicle but could not identify either of them.

Within minutes, additional officers arrived and they all approached the vehicle with their guns drawn.  The passenger, who was the defendant's brother, was ordered out of the vehicle and placed in handcuffs.  When the defendant was ordered out of the vehicle, he refused to comply and was forcibly removed.  At some point during the forcible removal from the minivan and his

---

[4] Before confirming that the second registration number was correct, an officer asked the daughter whether the "6" she recorded could have actually been a "G."  The daughter said that she was unsure, but the officer replaced the "6" with the letter "G" and got a match.

being escorted to the police cruiser in handcuffs, the defendant said, without any prompting, "That's my little brother.  He had nothing to do with what happened earlier."  Search of the defendant uncovered, among other things, $1,610 in various denominations, a bag of marijuana, and a small digital scale.

Police remained at the location with the defendant and his brother and, beginning at around 12 A.M. on March 23, 2010, police conducted showup identification procedures of the two men.  Of the witnesses who participated in the showup identifications, three had observed the vehicle in which the two men had been traveling earlier that evening, three had observed the perpetrators' faces, and two had observed the perpetrators while they were wearing masks.  The witnesses were instructed that they were not to discuss the identification procedures or the results with other witnesses.  They were also instructed that it was just as important to clear an innocent person as it was to identify a guilty one, and that the individuals they were about to see may or may not be wearing the same clothing as they were wearing earlier that evening.

Each witness was then separately driven to where the minivan was parked and illuminated by the headlights of a police cruiser.  After each witness arrived, the defendant was escorted out from the back of a police cruiser and stood in front of the transport vehicle so that the vehicle's headlights would

illuminate the defendant.  The defendant's hands were cuffed behind his back and an officer with a flashlight stood on either side of the defendant to illuminate his face.  The same process was repeated with the defendant's brother.

All three of the witnesses who had seen the perpetrators' vehicle earlier that evening -- Brown and the woman and her daughter -- positively identified the minivan that the defendant had been driving as the same vehicle they had seen earlier that evening, with the woman pointing out the lettering on the windshield she had seen earlier.  Although the woman was unable to express confidence that the defendant was one of the two men she had seen getting out of the minivan, her daughter identified the defendant as being the same height and size as one of the two men she had observed earlier that evening.

LaPalm and Brown had seen both men while they were wearing masks, while the three college students had observed both men at close range without masks.  Both LaPalm and Brown identified the defendant as being the same height and build as the taller perpetrator.  LaPalm also believed that the defendant was the same complexion as the intruder who was in her kitchen.  Two of the college students positively identified the defendant, and the third was confident that the defendant was the same size, build, and complexion as the taller man that he had seen outside his house, but could not confirm that the defendant was that

person.  With the exception of the mother, all the witnesses excluded the defendant's brother as either one of the two men they had observed that night near LaPalm's apartment complex.

The defendant was then placed under arrest, and police sent the his T-shirt, jeans, and sneakers for testing.  Although officers observed no visible stains on the defendant's white T-shirt during booking, a forensic scientist subsequently discovered light red-brown bloodstains on it.  Forensic testing revealed the presence of the victim's deoxyribonucleic acid (DNA) on that T-shirt.  A test of the defendant's hands for gunshot primer residue came back negative.

A search of the vehicle performed on March 24, 2010, revealed a red-brown stain on the inside of the door on the passenger's side of the vehicle.  That stain tested positive for the victim's DNA.

In July, 2013, the defendant was convicted of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder with armed home invasion and armed robbery as the predicate felonies.  The defendant also was convicted of armed home invasion (two counts), assault by means of a dangerous weapon (three counts), unlawful possession

of a firearm, and unlawful possession of ammunition without a firearm identification card.[5]

While the defendant's direct appeal was pending in this court, the defendant filed a motion for a new trial. The motion judge, who had also been the trial judge, denied the motion, and the defendant appealed. The appeals were consolidated.

Discussion. Where, as here, an appeal from the denial of a defendant's motion for a new trial has been consolidated with a direct appeal from a conviction of murder in the first degree, we review both under G. L. c. 278, § 33E. See Commonwealth v. Alicea, 464 Mass. 837, 840 (2013).

1. Exclusion of third-party culprit and Bowden evidence. At trial, the defendant sought admission of an audio recording of the police radio broadcast published after the shooting that contained various witness descriptions of the suspects.[6] Defense counsel argued that the audio recording was relevant to show that the police investigation was inadequate, thus pursuing a so-called Bowden defense, see Commonwealth v. Silva-Santiago, 453 Mass. 782, 802 (2009), citing Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980). The judge concluded that the

---

[5] The defendant was acquitted of assault and battery on a police officer.

[6] Different portions of the police radio broadcast described the perpetrators as: five feet, five inches tall; five feet, six inches tall; five feet, seven inches tall; and six feet tall.

portions of the recording containing physical descriptions of the perpetrators was hearsay, and excluded them. The judge instead allowed the defendant to play portions of the recording that involved the changed vehicle registration number, as well as portions containing information about the defendant having been previously stopped by police in the same vehicle.[7]

The defendant contends that the physical description portions of the audio recording were admissible both as third-party culprit evidence and as evidence of an inadequate investigation under Bowden, and that the judge's exclusion of these portions constituted reversible error. We consider separately the admissibility of the audio recording under each theory advanced by the defendant because, "[a]lthough the same evidence often may be used to support a third-party culprit defense and a Bowden defense, these two defenses are 'logically (and legally) distinct.'" Commonwealth v. Hoose, 467 Mass. 395, 409 n.6 (2014), quoting Silva-Santiago, 453 Mass. at 800.

a.  Third-party culprit evidence.  "A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it." Silva-Santiago, 453 Mass. at 800, quoting Commonwealth v. Lawrence, 404 Mass. 378, 387 (1989). See Mass.

_____

[7] In light of the judge's ruling, defense counsel declined to play the recording.

G. Evid. § 1105 (2018). As a result, we afford "wide latitude to the admission of relevant evidence" insofar as it tends to show that "a person other than the defendant may have committed the crime charged." Silva-Santiago, supra at 800-801. "If the evidence is 'of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'" Id. at 801, quoting Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008). However, "because the evidence is offered for the truth of the matter asserted -- that a third party is the true culprit -- we have permitted hearsay evidence that does not fall within a hearsay exception only if, in the judge's discretion, the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other substantial connecting links to the crime" (quotations and citation omitted). Silva-Santiago, supra at 801. "Because the issue is one of constitutional dimension, we are not bound by an abuse of discretion standard, but rather examine the issue independently." Conkey, supra at 66-67.

The defendant did not assert a third-party culprit defense at trial. Even if he had, however, we would discern no error in the exclusion, as third-party culprit evidence, of those portions of the audio recording that contained witness descriptions of the perpetrators. The recording was inadmissible "layered" hearsay, i.e., unidentified police

officers stating for the purpose of identifying the perpetrators what an unidentified person or persons said the perpetrators looked like.  See Commonwealth v. Cassidy, 470 Mass. 201, 216 (2014), citing Commonwealth v. Caillot, 449 Mass. 712, 721 (2007) (layered hearsay with uncertain sources unreliable and inadmissible as third-party culprit evidence).

b.  Evidence undermining police investigation.  The defendant's alternate theory is that the portions of the audio recording containing physical descriptions of the perpetrators were admissible as part of his inadequate police investigation defense under Bowden.  Because "the exclusion of evidence of a Bowden defense is not constitutional in nature," we review the judge's ruling under an abuse of discretion standard.  Silva-Santiago, 453 Mass. at 804 n.26.  The defendant preserved his objections to the judge's rulings on this issue at trial.[8]

---

[8] Although defense counsel did not specifically object to the judge's adverse ruling, the fact that he made an offer of proof as to those portions of the audio recording's admissibility put the judge on notice of the purpose of the proffered evidence.  See Mass. R. Crim. P. 22, as appearing in 378 Mass. 892 (1979); Commonwealth v. Bonds, 445 Mass. 821, 828 (2006) ("We have consistently interpreted [rule 22] to preserve appellate rights only when an objection is made in a form or context that reveals the objection's basis"); Commonwealth v. Jewett, 392 Mass. 558, 562 (1984), quoting Commonwealth v. Graziano, 368 Mass. 325, 330 (1975), S.C., 371 Mass. 596 (1976) (counsel is "not required to make further efforts 'in the face of [a] judge's unequivocal adverse ruling'").  See also Mass. G. Evid. § 103(a)(2) (2018).  This is especially true in light of the extensive sidebar discussions about the audio recording throughout trial.

Accordingly, we review for prejudicial error if there is an abuse of discretion.  See Cassidy, 470 Mass. at 210, citing Commonwealth v. Ridge, 455 Mass. 307, 317-318 (2009).

A defendant may rely on deficiencies or lapses in police investigations to raise the specter of reasonable doubt. Bowden, 379 Mass. at 486.  A defendant asserting a Bowden defense may "challenge the adequacy of a police investigation and may use information concerning third-party culprits to question whether the police took reasonable steps to investigate the crime."  Ridge, 455 Mass. at 316, citing Bowden, supra.  See Mass. G. Evid., supra at § 1107(a).  This defense suggests to the jury "that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated," with the result that the police may have missed "significant evidence of the defendant's guilt or innocence."  Silva-Santiago, 453 Mass. at 801. "Because any statements introduced as part of such a defense are offered not for their truth, but to prove that the police did not take 'reasonable steps to investigate,' those statements are not hearsay."  Commonwealth v. Bizanowicz, 459 Mass. 400, 414 (2011), quoting Ridge, supra.  See, e.g., Commonwealth v. Caruso, 476 Mass. 275, 295 n.15 (2017) ("If the out-of-court

statement is offered for any purpose other than its truth, then it is not hearsay").

A defendant does not, however, have an unfettered right to elicit evidence regarding the adequacy of the police investigation. The admissibility of such evidence hinges first, and foremost, on its relevance. See Harris-Lewis v. Mudge, 60 Mass. App. Ct. 480, 485 (2004); Mass. G. Evid., supra at §§ 401, 402. See also Silva-Santiago, 453 Mass. at 801, quoting Commonwealth v. Rosa, 422 Mass. 18, 22 (1996) (evidence "must have a rational tendency to prove the issue the defense raises"); Commonwealth v. Thompson, 382 Mass. 379, 383 (1981) ("all relevant evidence is admissible unless barred by an exclusionary rule" [citation omitted]). Relevant evidence means evidence having "any tendency" to make a consequential fact more or less probable than it would be without that evidence. See Mass. G. Evid., supra at § 401. As a result, evidence need not carry any particular weight to be relevant; it must only provide a link in the chain of proof bearing on an issue of consequence. Commonwealth v. Arroyo, 442 Mass. 135, 144 (2004). If evidence is relevant to the adequacy of the police investigation, the judge must then determine whether the probative value of the Bowden evidence is substantially outweighed by the danger of

unfair prejudice. See Mass. G. Evid., supra at § 403. See also Harris-Lewis, supra.[9]

Here, because the descriptions were not being offered for their truth, i.e., to show that the defendant did not match the descriptions of the perpetrators relayed by police, the judge erred in concluding that the portions of the audio recording that contained descriptions of the perpetrators constituted inadmissible layered hearsay. See Commonwealth v. Reynolds, 429 Mass. 388, 390-392 (1999) (informants' statements relayed from one officer to another not inadmissible layered hearsay under Bowden). See also Silva-Santiago, 453 Mass. at 803 (evidence inadmissible under third-party culprit theory may be admissible as part of Bowden defense). The descriptions were being offered

_____

[9] Our case law has not always been consistent regarding the standard for excluding evidence because the evidence is unfairly prejudicial. See Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014). In contrast to the "more exacting standard" of admissibility under Crayton, supra, where "other bad acts" evidence should be excluded where "its probative value is outweighed by the risk of unfair prejudice," evidence offered in furtherance of a defense under Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980), should be excluded only where its probative value is substantially outweighed by the danger of unfair prejudice. See Mass. G. Evid., supra at §§ 403, 404(b). The standard of admissibility for Bowden evidence articulated in Commonwealth v. Silva-Santiago, 453 Mass. 782, 803 (2009), did not accurately reflect the appropriate balancing test. See id. (considering "whether the probative weight of the Bowden evidence exceeded the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters"). We therefore clarify: Bowden evidence is admissible so long as its probative value is not substantially outweighed by its prejudicial effect. See Mass. G. Evid., supra at § 403.

to show that, once police stopped the defendant, they focused their investigation on the defendant to the exclusion of all others, even though the defendant did not match the physical descriptions in the broadcast. See Commonwealth v. Phinney, 446 Mass. 155, 166 (2006), S.C., 448 Mass. 621 (2007). Therefore, the portions of the audio recording that contained descriptions of the perpetrators were relevant to the defendant's Bowden defense, and nothing in the record suggests that the evidence's probative value was substantially outweighed by a danger of unfair prejudice. The portions of the recording containing descriptions of the perpetrators should have been admitted at trial.

Although the judge erred in excluding those portions of the police broadcast, the error did not prejudice the defendant. The defendant was permitted to challenge the adequacy of the investigation as a whole, including that police failed to pursue other leads based on inconsistencies in the initial descriptions. See Commonwealth v. Alcantara, 471 Mass. 550, 562-563 (2015); See Ridge, 455 Mass. at 316. Defense counsel had an opportunity to cross-examine witnesses about the various descriptions and to argue the point in closing argument. See Commonwealth v. Wood, 469 Mass. 266, 278 (2014). Moreover, the various initial descriptions of the perpetrators' heights are insignificant in view of the almost exact match of the actual

numbers of the registration plate of the vehicle the defendant had been driving, the defendant's positive identification by two witnesses, the defendant's statement to police, and the DNA evidence found in the vehicle and on the defendant's person. The identification by witnesses were corroborated through records from the Springfield school department indicating that the victim and the defendant had attended school together, just as the victim exclaimed when she had pulled down the taller intruder's mask. The defendant was not prejudiced.[10]

2. Failure to preserve and disclose the booking video tape recording. During pretrial discovery, the Commonwealth turned over video recordings that, the prosecutor claimed, showed the defendant's booking at the Springfield police station. Shortly before trial, defense counsel learned that the prosecutor had failed to turn over the correct video recording and instead had

---

[10] The defendant also argues that the judge impermissibly interfered with trial counsel's strategy and undermined his right to present a defense by excluding portions of the broadcast that included descriptions of the perpetrators, as well as portions containing information about the defendant having been stopped in the same vehicle on a prior occasion. Although we agree that "it is the defendant and his counsel, and not the judge, who must evaluate the risks of their trial strategy," Commonwealth v. Vardinski, 438 Mass. 444, 455 (2003), as previously discussed, the judge's evidentiary ruling did not preclude the defendant from presenting a Bowden defense to the jury. Cf. Commonwealth v. Bizanowicz, 459 Mass. 400, 419 (2011) ("the judge's exclusion of  [evidence did not] deprive the defendant of the ability to present a defense suggesting that [a third-party] was the killer").

turned over a videotape recording of another unidentified African-American man wearing a white T-shirt leaning against the booking desk.  Defense counsel did not, however, notify the prosecutor that he had provided the incorrect booking videotape.  Instead, defense counsel made a strategic decision to offer the incorrect booking videotape at trial to reinforce his Bowden defense.  Specifically, defense counsel intended to play the recording to show that police had turned over the wrong videotape, that the defendant did not have blood on his T-shirt when he first arrived at the police station, and that the victim's blood was transferred to the defendant's T-shirt through contact with the booking desk.  The judge subsequently denied defense counsel's request to play the incorrect booking videotape, but allowed him to question police witnesses about the absence of visible bloodstains on the defendant's T-shirt.

The defendant now contends that he is entitled to a new trial because the Commonwealth failed to preserve and disclose the correct videotape recording.  We disagree.  A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden to establish "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [evidence] would have produced evidence favorable to his [or her] cause" (citation omitted).  Commonwealth v. Neal, 392 Mass. 1, 12 (1984).  See

Commonwealth v. Olszewski, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994). If the defendant meets that initial burden, "a balancing test is employed to determine the appropriateness and extent of remedial action." Commonwealth v. Willie, 400 Mass. 427, 432 (1987). The judge "must weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant." Id.

We assume, without deciding, that cases addressing lost or destroyed evidence apply here because the Commonwealth failed to provide a videotape it claimed to have provided before trial, and that the defendant satisfied his initial burden of establishing a reasonable possibility that access to the videotape recording would have produced favorable evidence. We conclude that the Commonwealth exhibited no bad faith and, even if the Commonwealth had been negligent in failing to preserve the recording, the defendant was afforded a sufficient opportunity to remedy any prejudice. The defendant was allowed, through cross-examination of police witnesses, to elicit testimony about the absence of visible blood stains on the defendant's T-shirt. This was sufficient to remedy any prejudice to the defendant. See Commonwealth v. Harwood, 432 Mass. 290, 302 (2000) ("Our courts have fashioned or upheld various judicial remedies for the loss of evidence"). See also Mass. G. Evid., supra at § 1102.

3. <u>The showup identification</u>. The defendant argues that the one-on-one showup identification procedures conducted within hours of the killing were so unnecessarily suggestive that they offend due process. Although one-on-one showup identification procedures are "generally disfavored as inherently suggestive," <u>Commonwealth</u> v. <u>Dew</u>, 478 Mass. 304, 306 (2017), they only raise due process concerns if it is determined that the procedure was unnecessarily or impermissibly suggestive. See <u>Commonwealth</u> v. <u>Figueroa</u>, 468 Mass. 204, 217 (2014); <u>Commonwealth</u> v. <u>Meas</u>, 467 Mass. 434, 441, cert. denied, 135 S. Ct. 150 (2014), quoting <u>Commonwealth</u> v. <u>Martin</u>, 447 Mass. 274, 279 (2006). Police are permitted to conduct a showup identification if there is a "good reason" to secure the prompt identification of a suspect. <u>Dew</u>, <u>supra</u>. However, even where there is "good reason" for a showup identification, "it may still be suppressed if the identification procedure so needlessly adds to the suggestiveness inherent in such an identification that it is 'conducive to irreparable mistaken identification.'" <u>Figueroa</u>, <u>supra</u>, quoting <u>Commonwealth</u> v. <u>Phillips</u>, 452 Mass. 617, 628 (2008). See <u>Dew</u>, <u>supra</u> at 307 ("the evidence must be excluded '[i]f there are special elements of unfairness'" [citation omitted]); <u>Commonwealth</u> v. <u>Austin</u>, 421 Mass. 357, 361 (1995).

Here, there was good reason to conduct showup identifications, and the procedures were not so unnecessarily

suggestive as to create a substantial risk of a mistaken identification. The crime involved an armed home invasion and homicide. The police had not located the firearm and the perpetrators were still at large. See Meas, 467 Mass. at 441 ("very good justification" for showup where firearm not recovered at scene). The showup took place within three hours of the shooting, see Figueroa, 468 Mass. at 218 ("good reason" for showup two and one-half hours after shooting to determine whether shooter was still at large); Bowden, 379 Mass. at 479 (showup identification conducted two hours after murder admissible), and there were no "special elements of unfairness, indicating a desire on the part of the police to 'stack the deck' against the defendant," Dew, 478 Mass. at 307, quoting Commonwealth v. Leaster, 395 Mass. 96, 103 (1985). Public safety was paramount, and a prompt identification served to limit risk to the public and to avoid the escape of dangerous suspects. See Austin, 421 Mass. at 364. Accordingly, the showup identification procedures were not so unnecessarily suggestive as to offend due process.[11]

---

[11] Relatedly, the defendant contends that the judge erred in denying his motion for a new trial because the jury were not given an instruction on cross-racial identifications. Because this case was tried before our decision in Commonwealth v. Gomes, 470 Mass. 352, 361-378 (2015), the judge was not required to give a cross-racial identification instruction. See Commonwealth v. Bastaldo, 472 Mass. 16, 23 (2015) ("Although it was not error before Gomes for the judge to decline to give a

4. Use of unavailable witness's testimony from prior proceeding. Because Brown died before trial, the Commonwealth introduced transcripts of his testimony from a pretrial hearing on the defendant's motion to suppress. The judge had previously allowed the Commonwealth's motion in limine regarding this testimony, over the objection of the defendant, before jury selection on the first day of trial. Because defense counsel did not renew his objection at trial, it was not preserved.[12]

At the suppression hearing, Brown testified that based on his observations of the perpetrators' hands, he believed the two

---

cross-racial instruction, such an instruction must be given in trials that commence after Gomes where there is a cross-racial identification"). The defendant did not request such an instruction and the judge's instruction adequately addressed the issue of reliability in eyewitness identifications. We therefore discern no error in the denial of the defendant's motion for a new trial on this ground. See Commonwealth v. Bly, 448 Mass. 473, 496 (2007).

[12] In Commonwealth v. Grady, 474 Mass. 715, 719 (2016), we held that a defendant need not "object to the admission of evidence at trial where he or she has already sought to preclude the very same evidence at the motion in limine stage, and the motion was heard and denied." The rule announced in Grady does not, however, apply retroactively. Id. See Commonwealth v. Vazquez, 478 Mass. 443, 448 n.2 (2017). We therefore review to determine whether any error created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Caruso, 476 Mass. 275, 292 (2017). We note, however, that even if the objection had been properly preserved, Charles Brown's testimony would have been admissible under the prior recorded testimony exception to the hearsay rule under Mass. G. Evid., supra at § 804(b)(1).

men were African-American.[13]  During his testimony before the grand jury, Brown testified, contrary to his testimony at the suppression hearing, that on the night he gave his statement to police, he was "under a lot of . . . stress," and that he was no longer sure whether he had seen the shorter man's hands.

The defendant makes two arguments related to the admission of transcripts of Brown's testimony.  First, the defendant contends that Brown's testimony was not admissible because it does not fall within the prior recorded testimony exception to the rule against hearsay and that its introduction violated the defendant's confrontation rights under the Sixth Amendment to the United States Constitution.  Second, the defendant argues that suppression counsel rendered deficient performance by not impeaching Brown with his prior grand jury testimony.

a.  Admissibility of Brown's prior recorded testimony.  "We need not decide the admissibility of [Brown's] testimony as prior recorded testimony under our common law rule.  If the standards of the confrontation clause are met in the admission of [Brown's] testimony, the interests of justice test applied under G. L. c. 278, § 33E, is also met."  Commonwealth v. Trigones, 397 Mass. 633, 638 (1986).  As a result, "we review the admission of the prior recorded testimony only to determine

---

[13] Before trial, suppression counsel withdrew, and the defendant was represented by different counsel for his trial.

whether it offends the defendant's confrontation rights."
Caruso, 476 Mass. 275, 293 (2017).

The admission of prior testimony does not violate the
defendant's confrontation rights "when the declarant is
unavailable, as a matter of law, to testify and 'the defendant
has had an adequate prior opportunity to cross-examine the
declarant.'" Caruso, 476 Mass. at 293, quoting Commonwealth v.
Hurley, 455 Mass. 53, 60 (2009). An adequate prior opportunity
means effective cross-examination at a prior proceeding
addressed to "substantially the same interests" where the
defendant had a "similar motive" to cross-examine the witness.
Caruso, supra. It does not mean cross-examination that is
"effective in whatever way, and to whatever extent, the defense
might wish." Id., quoting Hurley, supra at 62. See Crawford v.
Washington, 541 U.S. 36, 57-59 (2004). "That a subsequent
[proceeding] involves additional evidence introduced against the
defendant does not mean that the opportunity for cross-
examination at an earlier [proceeding] is inadequate to satisfy
the confrontation clause." Commonwealth v. Sena, 441 Mass. 822,
833 (2004).

Here, the issues at trial and the defendant's motive on
cross-examination at the suppression hearing were sufficiently
similar to satisfy the confrontation clause. Brown's testimony
at the suppression hearing dealt with the same underlying events

-- Brown's observations of the perpetrators and the vehicle on the night of the killing -- and his testimony was admitted at the defendant's trial for that very same purpose. See Hurley, 455 Mass. at 61-62; Commonwealth v. Canon, 373 Mass. 494, 500-501 (1977), cert. denied, 435 U.S. 933 (1978). The defendant also had the same motive to cross-examine Brown -- to undermine his identification. Therefore, these issues had been subject to adequate cross-examination sufficient to satisfy the confrontation clause and our review pursuant to G. L. c. 278, § 33. See Caruso, 476 Mass. at 295; Sena, 441 Mass. at 833.

b. Use of grand jury testimony for impeachment. The defendant contends that suppression counsel also rendered deficient performance by not impeaching Brown with his prior grand jury testimony. Failure to impeach does not, standing alone, constitute ineffective assistance of counsel. See Commonwealth v. Johnston, 467 Mass. 674, 696 (2014); Commonwealth v. Fisher, 433 Mass. 340, 357 (2001), citing Commonwealth v. Bart B., 242 Mass. 911, 916 (1997). "Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference." Commonwealth v. Hudson, 446 Mass. 709, 715 (2006), quoting Fisher, supra. "[A]bsent counsel's failure to pursue some obviously powerful form of

impeachment . . . , it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." Hudson, supra, quoting Fisher, supra.

Here, suppression counsel should have cross-examined Brown with inconsistencies between his testimony before the grand jury and at the suppression hearing. We are confident, nonetheless, that suppression counsel's failure to do so had no bearing on the outcome of the case. The inconsistencies were not material, because the record contains an abundance of evidence with identifications of both the defendant and the vehicle he was driving that night; these instances include identification of the vehicle the defendant had been driving by the mother and her daughter and, more importantly, the positive identification of the defendant by two of the college students at the showup.

5. Motion for new trial. The defendant argues that his trial counsel was constitutionally ineffective in a number of respects, and that the motion judge, who was also the trial judge, abused his discretion in denying the defendant's motion for a new trial that raised these claims. Specifically, the defendant argues that his trial counsel was ineffective for (i) failing to consent to the nolle prosequi of the marijuana possession charge, and (ii) failing to call a blood spatter expert at trial. The defendant also argues that the judge erred in denying his motion for a new trial because of newly

discovered evidence of video technology that was not available at the time of the defendant's trial.

Because the defendant was convicted of murder in the first degree, "[r]ather than evaluating an ineffective assistance claim under the traditional standard of Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), . . . we apply the more favorable standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice." Commonwealth v. Gulla, 476 Mass. 743, 745-746 (2017), citing Commonwealth v. Wright, 411 Mass. 678, 681–682 (1992), S.C., 469 Mass. 447 (2014). See Alicea, 464 Mass. at 845. "Under this standard, [w]e consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion" (quotation and citation omitted). Commonwealth v. Long, 476 Mass. 526, 529 (2017). Tactical decisions by an attorney are error only if they were "manifestly unreasonable when made." Commonwealth v. Lang, 473 Mass. 1, 14 (2015).

a. Ineffective assistance of counsel. i. Strategic choices regarding nolle prosequi. The defendant was indicted on charges of possession of a class D substance (marijuana) with intent to distribute, G. L. c. 94C, § 32C (a). Before trial, the Commonwealth sought to enter a nolle prosequi on that

charge, but defense counsel refused. Subsequently, trial counsel used the possession charge to explain the defendant's inculpatory statement to police, as well as his possession of marijuana, a scale, and $1,610 in various denominations. The charge was nol prossed after the close of evidence, but before closing arguments.

The defendant now contends that his trial counsel was ineffective for failing to consent to the nolle prosequi, failing to challenge the indictment on the grounds that Sonja Farak was the confirmatory chemist,[14] and putting evidence of the defendant's drug dealing activities before the jury.

The defendant has not shown that his trial counsel's tactical decision was manifestly unreasonable. To the contrary, this situation presents a textbook example of a reasonable strategic concession. Within minutes of apprehension, the defendant made a statement to police that seemingly implicated himself in the shooting. Based on the defendant's statement to police, it was a reasonable strategy at trial to justify those statements by suggesting that the defendant was referring to another criminal offense that, when compared to those before the jury, was seemingly innocuous. Moreover, this strategy provided

---

[14] For a description of Sonja Farak's misdeeds as a chemist at a State drug laboratory see, e.g., Committee for Public Counsel Servs. v. Attorney Gen., 480 Mass. 700, 706-710 (2018).

the jury with a possible explanation -- apart from the inference that these items had been secured in the strongbox that had been stolen from the victim's bedroom -- for the defendant's possession of marijuana, a digital scale, and $1,610 in various denominations. The challenge trial counsel faced was not potential prejudice because the defendant may have sold marijuana, but overwhelming circumstantial evidence of guilt in the murder along with compelling DNA evidence and the defendant's inculpatory statement. Although not entirely without risk, this strategy was not manifestly unreasonable. See Commonwealth v. Vardinski, 438 Mass. 444, 455 (2003); Commonwealth v. White, 409 Mass. 266, 277 (1991). Accordingly, we discern no error.

ii. Failure to call expert witness. The defendant contends that his trial counsel was ineffective in failing to offer at trial the testimony of a blood spatter expert. The defendant asserts that a blood spatter expert could have explained that the blood stain on the defendant's T-shirt was a transfer stain. He further contends that an expert should have been called to explain the significance of the absence of gunshot residue on the defendant's hands. Although the defendant offered the curriculum vitae of a blood spatter expert, the defendant has not submitted an affidavit from that expert describing the testimony that he would have offered if

called to testify.  A claim of ineffective assistance of counsel
"for failure to call an expert witness is generally doomed where
'[t]he defendant's claim is not supported by any affidavits' to
disclose the content of the omitted expert testimony" (citation
omitted).  Alicea, 464 Mass. at 850-851.  Through cross-
examination of the Commonwealth's experts, trial counsel
elicited evidence that the bloodstains on the defendant's T-
shirt could not be classified as spatter stains, thereby
providing support for the defendant's theory that the
bloodstains on the defendant's T-shirt were transfer stains.
See Commonwealth v. Seino, 479 Mass. 463, 474 n.18 (2018)
(ineffective assistance claim fails where defense counsel,
through cross-examination of Commonwealth's experts, "elicited
evidence to support the defense's theory of how the defendant's
blood was transferred to the victim").  Accordingly, the
defendant's argument fails.

   b.  Newly discovered evidence of videotape technology.  The
defendant argues that his motion for a new trial should have
been allowed on the ground of newly discovered evidence that
allegedly casts doubt on whether he had blood on his T-shirt at
the time of booking.

   A defendant seeking a new trial on the ground of newly
discovered evidence must first establish that the evidence was
not discoverable at the time of trial despite the due diligence

of the defendant or defense counsel. Commonwealth v. Jones, 432 Mass. 623, 633 n.6 (2000). Commonwealth v. Salvati, 420 Mass. 499, 507 (1995). The defendant must then show that the newly discovered evidence "casts real doubt on the justice of the conviction" (citation omitted). Id. at 506. In order to obtain a new trial on the ground of newly discovered evidence, there must be "a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." Commonwealth v. Moore, 408 Mass. 117, 126 (1990), quoting Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986).

The defendant has failed to provide an expert affidavit showing that new video technology, not available at the time of the defendant's trial, could be used to show that the defendant did not have any blood on his T-shirt at the time of booking. The defendant has instead provided an affidavit from his sister concerning conversations she had had with various videography experts and what they had told her that this new technology would show. The judge did not err in denying the defendant's motion for a new trial on this ground. See Alicea, 464 Mass. at 850-851; Seino, 479 Mass. at 474.

6. Review under G. L. c. 278, § 33E. Finally, the defendant argues that we should exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdict for various reasons. The defendant contends that he is

entitled to relief based on (1) insufficient "physical evidence" connecting the defendant to the crime; (2) misconduct by members of the Springfield police department; (3) the judge's failure to apply the correct standard in ruling on the defendant's motion for a new trial; (4) credibility issues involving the Commonwealth's key witness; and (5) the exclusion of portions of the police audio recording in contravention of the doctrine of verbal completeness.

"When we undertake review under [G. L. c. 278,] § 33E, we do not function as a second jury. . . . That is we do not determine what verdict we would have returned but whether the verdict 'was against the law or weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require'" (citation omitted). Commonwealth v. Johnston, 467 Mass. at 705, quoting G. L. c. 278, § 33E. Having carefully reviewed the defendant's arguments pursuant to our duty under G. L. c. 278, § 33E, we conclude that the defendant is not entitled to relief. Not only do many of the defendant's supplemental claims have no arguable basis in either law or fact, but also they are patently without merit. See note 2, supra. For example, the defendant argues that he is entitled to relief because LaPalm, the Commonwealth's key witness, "was a drug addict." It is for the jury to make a determination of credibility, Commonwealth v. Cannon, 449 Mass. 462, 469 n.17

(2007), and "[s]uch a determination does not inform whether there was sufficient evidence of the crime," id.

Although the defendant contends that the case rests solely on unreliable witness identifications, the evidence of the defendant's guilt in this case was overwhelming. That the murder weapon was never recovered and that the defendant's DNA was not found inside the victim's apartment does not render all other evidence of the defendant's guilt nugatory. See Commonwealth v. Rakes, 478 Mass. 22, 32 (2017) ("A conviction may rest exclusively on circumstantial evidence"). Based on our careful review of the entire trial record and our consideration of each issue raised by the defendant, we decline to reduce the degree of guilt, order a new trial, or grant other relief under G. L. c. 278, § 33E.

Judgments affirmed.

Order denying motion for
a new trial affirmed.