# IN THE COURT OF APPEALS OF IOWA

No. 20-0158
Filed July 21, 2021

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**TANNER JON KING,**
 Defendant-Appellant.

_____

Appeal from the Iowa District Court for Webster County, Kurt J. Stoebe, Judge.

A defendant challenges his two convictions for first-degree murder. **AFFIRMED.**

Jack Bjornstad of Jack Bjornstad Law Office, Spirit Lake, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Tabor and Schumacher, JJ., and Carr and Gamble, S.J.*

*Senior judges assigned by order pursuant to Iowa Code section 602.9206 (2021).

**TABOR, Judge.**

This double homicide case raises a narrow question. Did the district court derail Tanner King's defense by limiting the testimony of a local barber who shared second-hand information about an alternative suspect with a police detective? Finding the court properly applied the Iowa Rules of Evidence, we affirm King's two convictions for murder in the first degree.

## I.  Facts and Prior Proceedings

Her shift at the convenience store ended at 11:00 p.m., and M.S. headed home to do some cleaning at the Fort Dodge duplex she shared with her grandmother. As she threw out the trash, M.S. "heard a whole bunch of gunshots" and "people screaming." When she looked out the window she saw a man running up the street. A streetlight allowed her to get a good look. M.S. testified the man carried a phone in one hand and a gun in the other. How certain was she about the weapon? "100 percent sure it was a gun." M.S. also testified the man's face was uncovered, allowing her to see his skin color was white.[1] Another neighbor called 911 at 12:03 a.m. to report two men on the ground in the alley. The caller looked out her window after hearing gunshots and screaming.

Responding to the 911 call, officers found two shooting victims—Eldominic (Dominic) Rhodes and his brother, Marion. Autopsies revealed Marion and Dominic suffered numerous gunshot wounds. Also in the alley, investigators collected seven fired cartridges, one unfired slug, and one fired bullet. Later

---

[1] As our record shows, King is white. Alternative suspect Cletio Clark is black. In an interview with police, M.S. identified King as the man she saw.

laboratory testing showed the bullets and fired cartridges were .40 caliber ammunition. Investigators could not locate a murder weapon.

Law enforcement considered both King and Cletio Clark as suspects.[2] King came into the picture when Fort Dodge Police Detective Larry Hedlund canvassed the neighborhood after patrol officers found the bodies. Hedlund and another officer knocked on King's door around 2:00 a.m. but received no answer. As the officers were leaving the apartment building, they encountered King on the second floor landing. When they asked King where he had been that night, he gave a series of alibis. Yet none of the people he mentioned (including Clark's girlfriend Meggin White) could confirm his whereabouts for the time of the shootings.

Likewise, police suspected Clark's involvement as surveillance cameras showed White's vehicle in the alley just before the shootings. When officers went to interview White at her apartment, they found Clark, whom they considered a "person of interest" in the investigation. Police interviewed White, who lied to provide an alibi for Clark.

Turning to King, police executed a search warrant at his apartment two days after the shootings. In his trash, they found a box of .40 caliber ammunition, missing fifteen bullets. At first, King told police the bullets did not belong to him, so he threw them away. But police also found a Wal-Mart receipt for the ammunition dated two days before the shootings. Surveillance video showed King shopping that day. King's landlady later found two bullets in a sock that he left

---

[2] King and Clark knew each other for more than two decades. Clark's cousin is the mother of King's nine-year-old daughter.

behind in his apartment. The ammunition found at King's apartment—according to state criminalist Victor Murillo—was similar in manufacture and design to the fired cartridges collected at the crime scene.

After the search, Detective Hedlund interviewed King at the station. King changed his story from their first encounter. When confronted with information that someone saw him running from the scene, King admitted hearing gunshots and "walking" away. King rationalized not telling the truth earlier, saying "I don't like talking to you guys."

Shifting back to the other suspect, the next day Detective Hedlund picked up Clark at the Black Hawk County jail and drove him to Fort Dodge.[3] Before questioning Clark during the drive, Hedlund gave Miranda warnings and told Clark that he was "implicated in the murder case." Clark insisted he killed no one. But he admitted asking White to craft an alibi for him.

After talking to Clark, Hedlund returned to King, who claimed Clark "did nothing." Instead, King said he saw four people in the alley but couldn't see their faces because they wore hoods. He allegedly heard them arguing about "papers" and discussing people from Missouri or Kansas. King thought "they were all black" because he believed "black people have a certain way they talk." King said after he heard shots he "took off" and "jogged" but not far because of a prior hip injury.[4]

Ping-ponging back to Clark, Detective Hedlund brought him from the Webster County jail for a second interview. Clark told Hedlund he was ready to

---

[3] Clark had separate robbery charges pending.
[4] King testified he incurred the injury when he jumped from the roof of the Webster County jail while trying to escape after his 2012 burglary conviction.

"quit going around the bush."  According to Clark, his girlfriend was mad at King because he sold her "some bad dope" and she wanted Clark to talk to him.  (Text messages between Clark and White support this claim.)  Clark told the detective that he confronted King about the low-quality drugs, and they argued.  As for the murders, Clark disclosed that he saw King shoot the Rhodes brothers.  And Clark claimed that King shot at him too.

Yet again, Hedlund interviewed King, relaying that Clark identified him as the shooter.  King continued to deny any role in the shootings.  When the detective confronted King with the text messages about the drugs, King acknowledged he was arguing with Clark, but King said he didn't "take it serious."

The State charged King with two counts of first-degree murder for shooting the Rhodes brothers and one count of attempted murder against Clark.  The State later amended the trial information to omit the attempted-murder count.

A jury trial occurred in November 2019.  In his testimony, Division of Criminal Investigations Agent Ray Fiedler estimated officers interviewed over one-hundred people as they tried to solve the crimes.  Those interviews yielded evidence incriminating King.  For example, White's friend Jaide Wetzel said she and White visited King's apartment a day before the shootings.  Wetzel saw a holster underneath his shirt with one or two handguns in it.  She recalled King was "acting different" than normal.  In a threatening manner, he displayed a shotgun on

the table and then set out three bullets, one in front of each of them.[5] He then let them leave.

Another witness remembered King acting "weird" right after the shootings. Although a reluctant witness for the State, H.K. testified she and her father, Paul Keller, had just heard about the shootings on the police scanner when King stopped at their house. King said he saw cars in the alley when on his "blunt walk."[6] King did not say he saw the bodies but did comment on his relationship with the Rhodes brothers, saying "he was pretty cool with both of them." He added that "he had had a few arguments with them but never too serious."

King's edginess persisted. When his girlfriend, Amber Bonewitz, visited his apartment a few days after the shootings, King acted nervous and said he expected "the feds would be knocking at his door." She saw him remove a "velcro belt" from his waist. She also remembered seeing a gun, but "he never took it out."

Toward the end of its case in chief, the State called Detective Hedlund to summarize the murder probe. Hedlund explained the investigation was "complicated" by "a lot of individuals, the defendant being one of them," who were "unwilling to answer questions" or "unwilling to be truthful." In a contentious cross-examination, defense counsel quizzed Hedlund about his understanding of "confirmation bias."[7] Hedlund defended his approach to following leads as they

---

[5] When questioned by Hedlund, King admitted acquiring that shotgun after the murders for his protection but insisted the weapon was "irrelevant" to the murders.
[6] In his testimony, King explained: "I smoke marijuana so I roll up a blunt and smoke it while I walk around."
[7] The defense later called forensic psychologist Wayne Wallace as an expert witness. He wrote his doctoral dissertation on "The Effect of Confirmation Bias on Criminal Investigation Decision Making." He defined confirmation bias as "the

came in. For instance, the detective rejected the premise that he "dismissed" information from Marion's brother-in-law, Jeremy Mack,[8] that Clark had a motive for the shootings. Also during that cross-examination, the defense elicited testimony that a source told Hedlund King left his gun at Keller's house.

After the State rested, the defense focused on blaming Clark for the murders. To that end, King subpoenaed Clark. But Clark refused to testify, invoking his privilege against self-incrimination and citing his pending robbery prosecution.

King took the stand in his own defense. From the start, he admitted he was not a truthful person. He justified lying to police because that was "the way [he] was brought up." King also said Clark told him to lie. According to King, he and Clark had been arguing by text the day before the shootings. When asked about the murders, King testified he was out for his nightly "blunt walk" when he heard four or five people yelling in the alley. King recalled they were wearing hooded sweatshirts, but he recognized one of them as Clark. When King heard the shots, he "did a little short jog" past the duplex where M.S. lived. King acknowledged going to Keller's house after hearing the shots but denied leaving anything there.[9] King added other details to implicate Clark. For example, he said Clark

---

selective seeking of evidence to reach a conclusion or a belief already determined. It includes seeking only information that agrees with your hypothesis or your theory. It includes ignoring disconfirmatory evidence or anything that disagrees with it." In Dr. Wallace's opinion, confirmation bias played a role in Detective Hedlund's investigation.

[8] Mack's sister testified that she was Marion's common-law wife.

[9] During his cross-examination, the prosecutor asked King: "If you had left the gun at Paul Keller's you'd lie about it; right?" King replied: "Yeah."

took bullets from the box at King's apartment. And he claimed that Clark came back to his apartment the day after the murders and described the victims as "snitches."

Beyond his own testimony, King called other witnesses to press his case against Clark. Central to the issue on appeal, King asked barber Priest Wilson to convey how he alerted Detective Hedlund to rumors in his shop that Clark was the shooter. In an offer of proof, Wilson described the pivotal role of the barbershop in his African-American community—calling it "church away from church." Because it was a place "where a lot of people gather to communicate," Wilson's barbershop became a hub for chatter about the Rhodes' murders. King sought to offer Wilson's testimony that he told Hedlund about Clark's gang-related motive for the shootings. But finding no reliable source for Wilson's information, the district court restricted his testimony. Surprisingly, the court took a different stance on defense witness Mack. The court allowed Mack to testify that word on the street was that Clark carried out a gang-related "hit" on the brothers.

The jury found King guilty as charged. The court sentenced him to consecutive life sentences. King now appeals.

## II.     Scope and Standards of Review

The parties disagree on the standard of review. King acknowledges we review evidentiary rulings for an abuse of discretion. *See State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). But because he is asserting a constitutional claim, King argues our scope of review is de novo. *See State v. Leedom*, 938 N.W.2d 177, 185 (Iowa 2020) ("Our review of a claim of a violation of the constitutional

right to present a defense, a Due Process Clause challenge, is de novo.").  By contrast, the State contends we review the rulings on admissibility of evidence for an abuse of discretion—without resort to de novo review.  *See State v. Countryman*, 573 N.W.2d 265, 266 (Iowa 1998) ("[T]here is no due process right to present evidence which is inadmissible under prevailing rules of evidence.").

We apply yet a different standard.  Because the court ruled on hearsay, we review for correction of legal error.  *State v. Ross*, 573 N.W.2d 906, 910 (Iowa 1998).  On other evidentiary questions, we review for an abuse of discretion. *Elliott*, 806 N.W.2d at 667.

### III.    Analysis

King raises a single issue: did the limit on Priest Wilson's testimony deny him a complete defense?  Invoking the so-called *Bowden* defense, King contends by restricting Wilson's testimony the court violated his right to due process.

Because Iowa case law has not addressed the *Bowden* defense, at least not by name, it is useful to explore its origins.  The defense takes its name from the 1976 murder conviction of Horace Bowden.  *Commonwealth v. Bowden*, 399 N.E.2d 482, 484 (Mass. 1980).  Bowden's attorneys cross-examined Boston police officers about the lack of scientific testing for gunpowder and fingerprints.  *See* Lisa J. Steele, *Investigating and Presenting an Investigative Omission Defense*, Crim. L. Bull., July 2021, at art. 1, n.3.  The judge instructed Bowden's jury that "the lack of evidence or the non-existence of a certain type of evidence is certainly not to be considered by you as any evidence in this case."  *Bowden*, 399 N.E.2d at 485 n.7.  The appellate court disavowed that instruction, holding, "The fact that

certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." *Id.* at 491. More generally, *Bowden* stands for the proposition that the accused may "rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates [the accused's] right to a fair trial by precluding the jury from considering evidence to that effect." *State v. Collins*, 10 A.3d 1005, 1025 (Conn. 2011).

At King's trial, specifically during Detective Hedlund's cross-examination, defense counsel drew the court's attention to *Bowden*, as well as a more recent Massachusetts case, *Commonwealth v. Silva-Santiago*, 906 N.E.2d 299, 314 (Mass. 2009), *holding modified by Commonwealth v. Moore*, 109 N.E.3d 484 (Mass. 2018). *Silva-Santiago* differentiated between (1) a *Bowden* defense, alleging inadequate police investigation, and (2) a third-party culprit defense, where the accused elicits evidence that tends to show that another person committed the crime. *Id.* Although distinct, the two defenses may overlap. *Silva-Santiago* held that information about a third-party culprit—whose involvement police never investigated despite receiving tips—may be admissible under a *Bowden* defense. *Id.* at 315. In that situation, the evidence is not offered to prove the truth of the matter asserted (that is the third-party's guilt), but to show that tipsters provided information to police, who failed to reasonably act on it. *Id.*

By contrast, if a defendant offers third-party culprit evidence for the truth of the matter asserted—that someone else is the true culprit—hearsay rules

apply.[10]  *Id.*   Under Massachusetts law, a judge may admit the hearsay if the defendant can show the evidence is otherwise relevant; it will not tend to prejudice or confuse the jury; and there are other "substantial connecting links" to the crime.  *Commonwealth v. O'Brien*, 736 N.E.2d 841, 851–52 (Mass. 2000).[11]

Defense counsel cited these Massachusetts cases after the following exchange with Hedlund about information he received from Jeremy Mack.

> Q. . . . One of the things you told him is "There's a lot of rumors and speculation going on out in the streets, which we don't really need any more of?"  A. That's true.
> Q. And Jeremy acknowledged that there was a lot of, quote, bullshit going on?

The State objected on hearsay grounds.  Defense counsel responded that *Bowden* and *Silva-Santiago* established that "a legitimate defense to pursue is that the State did not conduct a fair investigation, and that in bringing forth that defense, the rules of hearsay need to be relaxed because you need to examine what the officers knew and what they ignored."  Counsel argued that to prove Clark's motive the defense needed to elicit testimony that Hedlund heard from Mack that "this case is about Johnny Young, that this is retaliation for Johnny—for the deceased snitching on Johnny Young and that Cletio Clark was involved in the hit in retaliation for them snitching on Johnny Young."  In response, the prosecutor contended that testimony would be "double hearsay," and the Massachusetts

---

[10] Hearsay refers to "a statement that a 'declarant does not make while testifying at the current trial' and which '[a] party offers into evidence to prove the truth of the matter asserted in the statement.'"  *State v. Dessinger*, 958 N.W.2d 590, 599 (Iowa 2021) (alteration in original) (quoting Iowa R. Evid. 5.801(c)).

[11] In Massachusetts, *Bowden* evidence is admissible if its probative value is not substantially outweighed by the danger of unfair prejudice.  *Moore*, 109 N.E.3d at 497 n.9.

cases did not change the Iowa Rules of Evidence. When the court asked if *Bowden* had been adopted in Iowa, defense counsel acknowledged, "Not by name." But counsel reasoned the State "opened the door" by claiming investigators "tracked down every viable lead." Counsel declared: "Hearsay or not, that is admissible."

After reviewing *Bowden* and *Silva-Santiago*, the court sustained the State's hearsay objection. While noting the difference between procedure in Iowa and Massachusetts, the court found insufficient evidence to determine whether the proffered statement was "any more than a street rumor." In managing the cross-examination, the court allowed defense counsel to ask Hedlund whether Mack "came in with a lead" and to "talk about [Hedlund] disparaging the lead." But the court prohibited inquiry into alternative suspects Clark and Young. Yet, as it happened, defense counsel did ask Hedlund about Clark: "And you told this witness that 'Had we arrested Cletio Clark, I guarantee you we'd have fifty people coming forward saying it wasn't Cletio, it was Tanner'; right?" Hedlund acknowledged it sounded like something he would say.

Later in his cross-examination, Hedlund confirmed he also heard from Wilson. But much like the questions about Mack, the district court limited what counsel could ask Hedlund about Wilson's tip. Defense counsel asked Hedlund how he reacted after speaking to Wilson about potential suspects:

> Q. . . . He directed you towards a third person who he thought had information about these people with motive? A. He told me he had heard something on the streets.
> Q. And you indicated that you would contact this third person? A. That I would contact the third person?
> Q. Yes. A. Yes.

Q. And although he wasn't indicating to you that this person had information about Tanner King, you told him that you thought this person knows a lot and that he probably knows where Tanner got his gun and he might know where it went after the murders; right? A. Yes.

Q. So just so we're clear, he was telling you to talk to this third person about other potential suspects. And your response was "I'll go talk to this person to see if he's got information about Tanner"? A. Something similar to that, yes.

The *Bowden/Silva-Santiago* issue reemerged when the defense called Wilson to testify. Outside the presence of the jury, the prosecutor posed preliminary questions. She asked if Wilson had relayed information to Hedlund that he had "heard on the streets." He answered: "I did hear. It wasn't in the street. It was in my barbershop." Wilson admitted he did not have "personal knowledge" about the shootings.

Defense counsel then made an offer of proof that Wilson told the detective that he heard Clark killed the Rhodes brothers. Wilson described Clark's motive:

A few years ago, Marion and Johnny got into some trouble with cashing checks. And I guess Marion snitched. And when Johnny was locked up, he encountered Cletio. And during . . . Johnny and Cletio being locked up, the conversation came up about what Marion had did. And that—that's what it was about.

Wilson also mentioned a regular customer who stopped frequenting the barbershop "right after the killings." Wilson told Hedlund that customer was "somebody that he needed to talk to." Wilson said Hedlund agreed he should talk to that person. But Hedlund told Wilson the purpose of that conversation would be to ask what King did with the gun.

In his limited testimony, Wilson told the jury he had worked as a barber in Fort Dodge for thirteen years and also managed a music group that featured the

Rhodes brothers. Wilson testified that he saw Marion Rhodes almost every day and had never seen "Marion have any beef with Tanner."

After receiving the rulings restricting his proposed "word on the street" evidence under *Bowden* and *Silva-Santiago*, the tide turned for King. The defense called Mack to the stand. Predictably, the State asked the court to place the same limits on the questioning of Mack as it did for Wilson's examination. Unpredictably, the court declined, explaining "it's appropriate for [Mack] to testify about what he has direct knowledge to concerning Johnny Young. And that would have to be conveyed to him directly." The court decided what Mack told Hedlund was "fair game" because it went to the defense argument that the detective "didn't look into all of these avenues."

Freed by that ruling, the defense asked Mack about his communication with Hedlund. Mack testified he told the detective about "bad blood" between Young and the Rhodes brothers because "somebody had snitched on somebody." Mack explained that both Clark and Young belonged to the Vice Lords gang. Mack told Hedlund that Dominic "was being told not to fuck with Johnny." In other words, Mack testified that he conveyed to the detective that Young ordered Clark to kill the brothers. To be clear, Mack's information did not implicate Clark alone. On cross, Mack acknowledged telling Hedlund: "It's not that Tanner King didn't do it." Mack just heard that others were also involved.

Because the court *did* allow King to pursue third-party culprit evidence through Mack's testimony, his complaint on appeal is a narrow one. He contends the limits on Wilson's testimony "hobbled" his *Bowden* defense. King ventures that

Wilson, a respected local businessperson, would have had more credibility with the jury than Mack because the jury heard Mack was in custody on an arson charge at the time of trial. King emphasizes Wilson's knowledge of the "word on the street," which was "flowing through his barber shop," would have corroborated Mack's version of events. King argues that without Wilson's testimony pointing to Clark, defense counsel "couldn't tie together the pieces with a credible thread."

Defense counsel clarified at oral argument that King was not pursuing a third-party culprit defense, where the evidence would be offered for the truth of the matter asserted. Rather, King proffered Wilson's testimony to show Detective Hedlund's responsive conduct was not reasonable. Under that *Bowden* framework, King argues the testimony would fall outside the definition of hearsay.

In addressing King's claim, we decline his implied invitation to adopt a new defense based on Massachusetts law. Instead, we see our role as applying Iowa law to decide if he is entitled to a new trial because the court limited Wilson's testimony. Under Iowa law, King had a right to present evidence relevant to his theory of defense. *See State v. Nelson*, 480 N.W.2d 900, 906 (Iowa Ct. App. 1991). Because King wished to offer evidence tending to incriminate another, he had to confine his proof to "substantive facts," which "create more than a mere suspicion" that another person committed the crime. *See State v. Farmer*, 492 N.W.2d 239, 242 (Iowa Ct. App. 1992). King met that standard. So the district court gave King a greenlight to present evidence pointing to Clark as the shooter. For instance, King testified he saw Clark in the alley the night of the shootings. And Mack testified to Clark's motive for killing the Rhodes brothers.

Yet King contends his defense was incomplete without Wilson's corroboration of Mack's testimony. That contention collides with our hearsay rule. King insists he was not offering Wilson's testimony for the truth of the matter asserted—that Clark was the killer—but to show its impact on Hedlund's investigation. True, when the proponent uses an out-of-court statement to prove something other than the truth of the matter asserted, such as responsive conduct, the court may admit the statement as nonhearsay. *Dessinger*, 958 N.W.2d at 603. But we must decide whether the statement is indeed relevant to the asserted purpose, or whether the statement seeks to put inadmissible evidence before the jury. *Id.*

After close examination, we find King offered the testimony for the truth of the matter asserted. Despite exploring Hedlund's confirmation bias, King's true purpose for offering Wilson's word-in-the-barbershop evidence was not to show how Hedlund responded. King did not seek Wilson's expanded testimony to show police received a lead about Clark and failed to follow it. Indeed, both Agent Fiedler and Detective Hedlund testified Clark was an early focus of their investigation. Law enforcement spoke with Clark several times, even transporting him from out of county. Rather, King aimed to expose the jury to more local gossip supporting his alternative-suspect theory. The content of the rumors—including Clark's alleged motive—carried relevance only if King was offering Wilson's second-hand information for the truth of the matter asserted—that Clark was the killer. King's "real purpose" was to show investigators made the wrong choice between two

suspects. Because the rumors Wilson heard were offered for their truth, they were inadmissible hearsay.

King's emphasis on Wilson's credibility underscores the point that King was interested in Wilson's testimony for the truth of the matter asserted. King does not argue Wilson's credibility matters because it would have constituted a more plausible or reliable tip to further Hedlund's investigation. Instead, King focuses on barber Wilson's credibility before the jury. Because no question existed that both Mack and Wilson relayed those rumors to Hedlund, the conduit's credibility is important only if the content of those rumors is at issue. Because King sought Wilson's testimony for its truth, the court properly excluded it.

Finally, even if the district court wrongly limited Wilson's testimony, any error was harmless. *See State v. Juste*, 939 N.W.2d 664, 675 (Iowa Ct. App. 2019) (examining record to see whether complaining party suffered miscarriage of justice or party's rights were injuriously affected by the error). King cannot show prejudice because Mack testified to similar rumors suggesting Clark was involved. Hedlund also testified that he received comparable tips from Mack and Wilson. Plus, the State showed the investigation included Clark as a potential suspect before more evidence pushed the needle toward King. Finally, the State presented strong evidence of King's guilt. That evidence included his shifting stories, the similarity between the .40 caliber ammunition at his home and the casings in the alley, an eyewitness who saw him fleeing the scene holding a gun, and several other witnesses who noted King acting strangely and anticipating law enforcement contact after the shootings. Because the proffered evidence constituted

inadmissible hearsay, King had no due process right to present it as part of his defense. The district court did not err in excluding the evidence. So we affirm the convictions.

**AFFIRMED.**